92JFRUXA

1

<pre>
     92JFRUXA
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 2   OLIVIA RUX, et al,
 3
 3                 Plaintiffs,
 4
 4          v.                            08 CV 6588 (AKH)
 5
 6   ABN-AMRO BANK N.V., et al,
 6
 6                 Defendants.
 7   ------------------------------x
 7                                    New York, N.Y.
 8                                    February 19, 2009
 8                                    11:15 a.m.
 9
 9   Before:
10
10                   HON. ALVIN K. HELLERSTEIN,
11
11                                    District Judge
12
12                       APPEARANCES
13
13   HALL, LAMB & HALL
14        Attorneys for Plaintiff Rux, et al
14   ANDREW C. HALL
15   MATHEW LETO
16   FRANKFURT KURNIT KLEIN & SELZ
16        Attorneys for Plaintiff Rux, et al
17   EDWARD ROSENTHAL
17   NICOLE HYLAND
18
18   MOSES & SINGER
19        Attorneys for Defendant ABN AMRO Bank
19   DANIELLE FRIEDBERG
20
20   PHILLIPS LYTLE
21        Attorneys for Defendant HSBC Bank
21   PAUL K. STECKER
22
22   COVINGTON & BURLING LLP
23        Attorneys for Respondents Deutsche Bank AG and Deutsche
23        Bank Trust Company Americas
24   MARK GIMBEL
25
                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300
</pre>

2

<pre>
     92JFRUXA
 1
 2                  APPEARANCES (Continued)
 3   ARNOLD & PORTER
 3        Attorneys for Objectant Nordea Bank Finland
 4   CHARLES G. BERRY
 4
 5   FREEHILL, HOGAN & MAHAR
 5        Attorneys for Respondent Receivers of Sabena S.A.
 6   PATRICK BONNER
</pre>

Page 1


EXHIBIT

92JFRUXA

TROUTMAN SANDERS LLP
     Attorneys for Respondent Bank of China
CHRISTINA H. BOST SEATON

LEVI LUBARSKY & FEIGENBAUM LLP
     Attorneys for Respondent JP Morgan Chase Bank, N.A.
     and Bank of New York Mellon
HOWARD B. LEVI

DAVIS WRIGHT TREMAINE LLP
     Attorneys for Respondent Citibank
SHARON L. SCHNEIER

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
     Attorneys for Respondent Calyon as successor to
     Credit Lyonnais
LISA HABE KUCK

ZEICHER ELLMAN & KRAUSE LLP
     Attorneys for American Express Bank and
     Bank of America
BRUCE S. GOODMAN

KEATING & MCHUGH
     Attorneys for KFW Bank
JOHN KEATING

Also Present:
DAVID S. JONES
JOHN D. CLOPPER
UNITED STATES DEPARTMENT OF JUSTICE

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

92JFRUXA
          (Case called)
          (In open court)
          THE DEPUTY CLERK:  In the matter of Rux v. ABN AMRO
Bank.  Counsel, please state your appearances for the record.
          THE COURT:  Be seated, everyone.  Just the people who
will be arguing, please.
          MR. HALL:  Good morning your Honor, Andrew Hall for
the plaintiffs.
          THE COURT:  Good morning, Mr. Hall.
          MR. HALL:  Good morning, your Honor.
          MR. GIMBEL:  Good morning, your Honor.  Mark Gimbel of
Covington & Burling for the respondents, Deutsche Bank and
Deutsche Bank Trust Companies America.
          MR. JONES:  Good morning, your Honor.  David Jones
from the United States Attorney's Office, Southern District of
New York for the United States as a non-party.
          THE COURT:  Anybody else?  Okay.  Mr. Hall, I think we
should start by having you tell us how we came here.
Mr. Rosenthal, sorry.
          MR. ROSENTHAL:  This is Mr. Rosenthal from Frankfurt
Kurnit.  Mr. Hall will be --
          THE COURT:  Mr. Hall.
          MR. HALL:  Thank you, your Honor.
          May it please the Court.  We started in this
proceeding to enforce a judgment in favor of the Rux plaintiffs
Page 2

92JFRUXA
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

4

92JFRUXA
1  against the government of Sudan that was entered by reason of
2  the government of Sudan's aid and assistance provided which led
3  to the bombing of the USS Cole.  We started this proceeding
4  with a petition for a turnover, and then we --
5          THE COURT:  First you received a judgment from the
6  United States District Court of the Eastern District of
7  Virginia?
8          MR. HALL:  Yes, your Honor we did.
9          THE COURT:  And the amount of the judgment was?
10         MR. HALL:  The amount of the judgment with interest to
11 date is approximately $13.1 million.
12         THE COURT:  And you started pursuant to Rule 69 of the
13 Federal Rules of Civil Procedure?
14         MR. HALL:  Correct, your Honor.
15         THE COURT:  Incorporating state turnover procedures
16 under the New York Civil Practice Law and Rules?
17         MR. HALL:  That's correct.
18         THE COURT:  That's how you're in this court.
19         MR. HALL:  That is how we are in this court and that
20 is how we came to join the respondents in this case.
21         Your Honor entered an order on June 26, 2008, which
22 started with directing the parties to meet and to develop a
23 procedure for the speedy turnover of funds which would be owed
24 to the petitioners subject to notice to third parties.  On
25 July 24, we submitted a joint letter outlining the procedure in
            SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

5

92JFRUXA
1  the sense that we were unable to come to an agreement as to how
2  to achieve those objectives, and in turn this Court entered its
3  own order determining the procedure.  That order was entered by
4  the Court on September 15, 2008.
5          Following that order, the procedure has been complied
6  with in the sense that each and every step contemplated by the
7  procedure has been followed, the notice requirements in
8  particular, by providing notice to each of the potential
9  claimants in the manner contemplated --
10         THE COURT:  What kind of claimants did you call them?
11         MR. HALL:  Potential claimants, your Honor.  And what
12 I mean by that, your Honor, specifically, is we proceeded to
13 attempt to obtain a turnover of all money either in the name of
14 the government of Sudan or its agencies or instrumentalities,
15 specifically the banks in the first instance were directed to
16 provide us with documentation that would allow us to identify
17 the funds which were held by those banks in amounts in excess
18 of $50,000.  Those documents were turned over.  That allowed us
19 to focus on specific accounts and specific claimants.
20         We added the Federal Reserve at the appropriate time
21 because we discovered there was money in Sudan with the Federal
22 Reserve.  At a point in time, your Honor directed that the
23 funds that were in controversy be tendered into the registry of
24 the Court.  Further order contemplated that the notice of the
25 pendency of the lawsuit be sent and that any potential person
            SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

6

92JFRUXA
1  claiming that they were not an agency or an instrumentality of
                        Page 3

92JFRUXA

2 the government of Sudan would have the opportunity to assert an
3 objection and to come forward with such evidence that may be
4 appropriate to establish that they are not an agency or that
5 their money is not subject to execution.
6 THE COURT: Yes, I treated the institutions in the
7 jurisdiction of this Court as in effect stakeholders, and using
8 the interpleader proceedings and procedures, ordered notice to
9 these stakeholders and in turn ordered the stakeholders to give
10 notice to anybody who had a potential interest in the accounts.
11 So the end of this proceeding, if we are all correct in our
12 assumptions, would be a turnover of funds that had been blocked
13 in the custody of these various institutions subject to the
14 jurisdiction of this Court and discharging protection of these
15 institutions against claims by others, if they had followed the
16 procedures set out by the Court.
17 MR. HALL: Right. And, your Honor, in that regard,
18 that is exactly what we have done, and as a result, what we did
19 when we realized the original judgment amount, your Honor, was
20 $12,275,860, at the time of the entry of the judgment, and
21 there has been accruing interest since that time.
22 THE COURT: What's the date of the judgment, Mr. Hall?
23 MR. HALL: The judgment was amended, and, let me just
24 look it up for one moment. Just a moment, your Honor, I'll
25 have it for you in a second.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

92JFRUXA

1 (Pause)
2 THE COURT: The amount that's due and owing is
3 $13,205,735.
4 MR. HALL: At this point, yes.
5 THE COURT: As of the time you began your proceedings
6 here, which was December 10, 2008.
7 MR. HALL: Correct. Since that time, we essentially
8 filed our second motion, which was essentially to complete the
9 process on the premise that the holders, the other half of the
10 stakeholders, had not filed objections. We only went to those
11 entities that did not file an objection, because we concluded
12 that there was sufficient sums in the registry of the Court to
13 satisfy the judgment. The judgment was entered on July 25,
14 2007. It was amended on August 2, 2007. The initial judgment
15 was $7,956,344. It was increased for prejudgment interest to
16 the 12,275,860 amount I told you about.
17 So essentially, it is our view that because the other
18 half of the interpleader, so to speak, has not asserted any
19 entitlement to an amount sufficient to satisfy, we are now
20 ready to have those funds turned over, because we have made the
21 necessary showing against both the agency and its
22 instrumentality, that we have attached sufficient exhibits to
23 demonstrate agency and instrumentality or that it is Sudan's
24 money directly to both the motion and to the reply, and we have
25 also attached documents provided by the banks reflecting the
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

92JFRUXA

1 ownership issue as well.
2 THE COURT: We have three banks subject to the
3 jurisdiction of this Court that are involved. Would you
4 correct me on this, Mr. Hall, please? American Express Bank,
5 Deutsche Bank, JPMorgan Chase.
6 MR. HALL: Also, I believe, your Honor, the Federal
Page 4

92JFRUXA

7  Reserve Bank is involved as well.  we brought them in in an
8  amendment.
9           MR. LEVI:  Bank of New York Mellon.  My client is also
10 here.
11          MR. GIMBEL:  And, your Honor, I would also add Deutsch
12 Bank Trust Company of Americas.
13          THE COURT:  I mentioned Deutsch Bank as a generality
14 without the specific name of the entity.  So there are five
15 entities:  American Express Bank, Deutsche Bank, JPMorgan
16 Chase, Federal Reserve Bank and the Bank of New York Mellon.
17          MS. SCHNEIER:  Your Honor, Citi is also here.
18          MR. BERRY:  Your Honor, I would note there are six
19 different banks, including the bank that I represent Finnish
20 Bank of Nordea that have objected.
21          THE COURT:  I am not asking for appearances now.
22 These are banks which have had accounts that are involved here
23 as to which no objections have been asserted.
24          MR. HALL:  That's correct, your Honor.  Citibank is
25 also present.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              9

92JFRUXA

1           THE COURT:  Citibank is involved too?  There's one
2  objection for one account.
3           MS. SCHNEIER:  There's one objection for one account
4  that came in a little late, so that is still included in their
5  petition.
6           MR. HALL:  We are satisfied there's still sufficient
7  money to satisfy the judgment without that objection.
8           THE COURT:  So the purpose here is to eliminate all
9  accounts where there are objections raised and focus only on
10 those accounts that have deposited funds as to which no
11 objection has been made.
12          MR. HALL:  By the claimant, yes, your Honor, the other
13 claimant, that's right.
14          THE COURT:  There is an objection by the United States
15 which I'll get to.
16          MR. HALL:  It's a statement of interest.  I'm not
17 sure, they're basically saying --
18          THE COURT:  I'm going to hear them, so.
19          MR. GOODMAN:  Bruce Goodman on behalf of American
20 Express Bank.  It's part of the record, I would just note we
21 received two objections with regard to funds that have been
22 turned over to the bank.  I don't believe petitioner is seeking
23 turnover of those funds today.
24          MR. HALL:  We are not.  Not as to those two.
25          MR. LEVI:  Howard Levi for JP Morgan Chase and Bank of
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                             10

92JFRUXA

1  New York Mellon.  Just so the record is clear, there have been
2  objections filed, but the final accounts designated in reply
3  papers by petitioners are accounts, included in which are my
4  two clients, as to which no objections have been filed.
5           THE COURT:  What I'd like to do is isolate and
6  identify those, Mr. Hall, in the order in which you're going to
7  tender to me.  You'll have enough specificity so that it will
8  be very clear which accounts are being turned over.
9           MR. HALL:  Yes, your Honor.
10          THE COURT:  And then there will be a question what to
11 do with the blocked funds in the registry of the Court that
                              Page 5

92JFRUXA

```
12   have not been turned over.  Right, Mr. Hall?
13          MR. HALL:  Yes, your Honor.
14          THE COURT:  I want to end this without any money in
15   the registry of the Court.
16          MR. HALL:  I'm happy to reach that same conclusion.
17   Let me start --
18          THE COURT:  Now, before we leave this, the sum total
19   of all these blocked accounts as to which no objections have
20   been registered, and which are going to be turned over to you,
21   do you have that number?  If one of your colleagues has the
22   number, just state your name.
23          MR. HALL:  We do, your Honor.
24          THE COURT:  And give me the number.  Sir, why don't
25   you just announce it?  What's your name?
```

11

92JFRUXA

```
 1          MR. LETO:  Matthew Leto.  The total number is
 2   $14,889,475.67.
 3          THE COURT:  That's more than you need.
 4          MR. HALL:  Correct, your Honor.  There are expenses
 5   involved, too.
 6          THE COURT:  Do I know them?  Are they disclosed?
 7          MR. HALL:  No, they are not identified for you of
 8   record at this moment, your Honor.
 9          MR. GIMBEL:  Your Honor, if I may, I just wanted to
10   make sure there are also among the accounts in this motion two
11   Deutsche Bank accounts of which there were objections made.  I
12   don't know whether they've been taken out of the figures that
13   were just given.
14          THE COURT:  Mr. Hall?
15          MR. HALL:  They're in the 14 million, they're not in
16   the amount we're going to ask to be turned over.
17          THE COURT:  I just want to know the amount you want
18   turned over where there's no objections.
19          MR. LETO:  Your Honor, actually, minus those two swift
20   objections, $14,643,825.
21          THE COURT:  And there are no objections to this
22   account?
23          MR. LETO:  No, your Honor.
24          MR. GIMBEL:  If I may, one housekeeping point.  There
25   has been a lot of confusion because of a lot of account numbers
```

12

92JFRUXA

```
 1   flying around, some of them partially redacted.  We would
 2   propose that perhaps the petitioners could show us the proposed
 3   order before they give it to the Court?
 4          THE COURT:  Right.  I'll tell you the procedure right
 5   now.  I want Mr. Hall to draft a proposed order, to clear it
 6   with all counsel having an interest in that order, then to
 7   submit the order to me.  If there are objections, I want it
 8   shown on a single proposed order sent to me explained by a
 9   single joint letter.  I don't want to be in a position of
10   waiting for the next letter to come.
11          MR. HALL:  That's fine.  Your Honor.  A week is fine?
12          THE COURT:  You pick the day.  A week is fine.
13          All right, now, the final amount is also subject to
14   expenses of the bank.
15          MR. HALL:  That's correct.
16          THE COURT:  How is that going to be determined?
```

Page 6

92JFRUXA

17     MR. HALL:  What we had thought would be an appropriate
18  procedure to represent to the Court, is our entitlement to the
19  sum ends with our judgment of interest.  We think the expenses
20  of the bank that occurred are stakeholder expenses that can be
21  charged against the fund, not our fund, and that should be
22  added as a cost, so to speak, and then the net balance turned
23  over.
24     THE COURT:  What would be the procedure that the banks
25  want to use?  Because I'm sure they want to be paid, and I'm

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

92JFRUXA

1   sure they want it settled by court order.
2      MR. GIMBEL:  Your Honor, I think we would propose
3   either attempting to reach a stipulation with the other parties
4   on this issue.
5      THE COURT:  Well, the plaintiff doesn't care.
6      MR. GIMBEL:  Then we could simply submit an
7   application to your Honor outlining the fees and expenses for
8   which we're seeking reimbursement.
9      THE COURT:  I'd like you to be modest in this.  I
10  don't want this to be an opportunity to sweep under the rug the
11  various kinds of items.  I don't think that there's been major
12  work by any firm, and please use last year's billing rates.
13     MR. GIMBEL:  Your Honor, we intend certainly to be
14  modest in what we submit.  The one thing I would note is that
15  just because of the sheer number of claimants involved here,
16  there were substantial expenditures on behalf of a lot of the
17  banks.  Just to take the example of Deutsche Bank, because I'm
18  most familiar with it, we had to serve more than 50 claimants
19  all around the world, to identify them from bank records, which
20  often didn't have addresses, to prepare interpleader petitions,
21  to translate them into Arabic, to serve them.
22     THE COURT:  How are you going to allocate?
23     MR. GIMBEL:  Well in the Winiger case, your Honor,
24  fees were deducted pro rata from the accounts that were awarded
25  and we suggest that's probably an appropriate solution here.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

92JFRUXA

1      THE COURT:  I'm not sure that's correct.  We're not
2   doing any adjudications with regard to the objections, so
3   arguably a frivolous objection has as much standing as an
4   objection with merit.  Seems to me that a proper allocation
5   would be -- and this is gratuitous on my part -- a proper
6   allocation would be against all affected accounts, whether
7   turned over or retained.
8      MR. GIMBEL:  I would note, your Honor, the case law we
9   cited in the respondent's submissions does establish that the
10  Court has very broad discretion in deciding how to allocate
11  fees and costs.
12     THE COURT:  I think, then, allocated among all
13  affected accounts to the extent you know them.  I don't think
14  you should do endless searching, but to the extent you know
15  them, I think they should be allocated per amount in the
16  account, I guess.
17     MR. GIMBEL:  Yes, your Honor.
18     MR. BERRY:  Your Honor, may I raise a question as to
19  the expenses which are not extensive, but they do exist, of
20  those claimants who have had to appear and file their
21  objections?  In our case, it was Chase who notified us of the

Page 7

92JFRUXA

22  proceedings here, and we were put to the expense of explaining
23  why the subject assets --
24          THE COURT:  Us is?
25          MR. BERRY:  Nordea Bank Finland.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

15

92JFRUXA

1           THE COURT:  You're a correspondent bank account?
2           MR. BERRY:  No, Chase was one of the intermediary
3   banks and wire transfers that were --
4           THE COURT:  We haven't even reached the wire transfers
5   yet.  That's the next point I want to raise, but come back with
6   this point, all right?
7           MR. BERRY:  Okay, thank you.
8           THE COURT:  I finished now with the blocked deposits.
9   All right, so we --
10          MR. HALL:  Excuse me, the number I gave you was for
11  all funds without regard to whether they were blocked or not.
12          THE COURT:  I need to know the amount that's going to
13  be turned over to you.  That's the amount that's interesting
14  me.  What's the distinction you're making to a blocked
15  account --
16          MR. HALL:  I'm not.  I'm not making a distinction
17  between a wire transfer, blocked account and another blocked
18  account.
19          THE COURT:  I wanted to have a number, if you have it,
20  with just the blocked accounts, leaving aside the wires.  Let
21  me put it this way, Mr. Hall.  The wire raises an interesting
22  preemption issue.  There's a conflict between federal law and
23  New York UCC law.
24          MR. HALL:  Yes, sir.
25          THE COURT:  Which I noted and discussed in my decision
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

16

92JFRUXA

1   in Navalmar.  I don't know whether it's still on appeal in the
2   Second Circuit or not.
3           MR. HALL:  As of two days ago, it is.
4           THE COURT:  Other district court judges in other
5   decisions of the Second Circuit have also ruled in favor of the
6   federal law pre-empting the state law on this issue, but for
7   the purpose of this case, it would be useful to know how much
8   you get from just the blocked accounts without getting into
9   this controversy.
10          MR. HALL:  We do not have enough to satisfy ourselves
11  from the blocked accounts.  The blocked accounts are --
12          MR. LETO:  Your Honor, it's $7,205,553.
13          THE COURT:  7 million --
14          MR. LETO:  205,553.
15          MR. HALL:  Are any of the objectors to the blocked
16  account?
17          MR. LETO:  No.
18          MS. SCHNEIER:  Yes.
19          MR. HALL:  Less 57.
20          THE COURT:  Less 57,000 -- let's go off the record.
21  Would you talk to whoever you have to talk to and just give me
22  a bottom line number.
23          (Discussion off the record)
24          MR. HALL:  Your Honor, subject to confirming the math,
25  which we will do in the order that we give you, it is
                SOUTHERN DISTRICT REPORTERS, P.C.
                        Page 8

92JFRUXA
(212) 805-0300

17

92JFRUXA
1  $7,068,489, together with interest from August of 2008 to date,
2  which we do not have.
3          THE COURT:  The order of magnitude is, therefore, that
4  little more than half of the funds that you're seeking come
5  from blocked accounts where there are no objections.
6          MR. HALL:  Correct.
7          THE COURT:  And how are you going to proceed against
8  the wired funds, again, where there are no objections?
9          MR. HALL:  Yes, your Honor.  The point that your Honor
10 raised, the distinction between the New York State law and the
11 federal law on the question, we think is conclusively resolved
12 by the Terrorism Risk Insurance Act, which preempts the entire
13 field involving terrorism and suggests that all of this
14 property, a property interest regardless of its nature is
15 subject to being turned over.  Therefore, the policy
16 considerations that your Honor noted in your opinion would be
17 inapplicable, the UCC would be inapplicable --
18         THE COURT:  The policy considerations are applicable
19 in the sense they pre-empt the policy considerations that
20 inform state law.
21         MR. HALL:  That's correct.
22         THE COURT:  I held in Navalmar that there are special
23 interests in New York and in the banking industry in New York
24 to protect cleared funds coming through the Federal Reserve
25 Bank in New York and the New York banks.  Any payment in
            SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

18

92JFRUXA
1  dollars from one source of the world to another source in the
2  world must come through New York, and therefore New York has
3  become a hub of people interested in attaching or blocking
4  funds, whether for private purposes as occurs in the maritime
5  field, which led to my decision in Navalmar or in terms of
6  government policy against terrorism following the funds and
7  seeking to choke financially the terrorists in terms of drug
8  policy or similar policies as to terrorism are at stake and so
9  on.  And I held that the federal policy is paramount, at least
10 without any expression to the contrary by Congress, and trumps
11 the New York policy.
12         There's a further analysis, if I recall correctly, in
13 the New York UCC, the official note, which argues that the
14 funds as they are onward transmitted by clearing banks are not
15 property.  I took issue with that in Navalmar, and under
16 standard rights and obligation analysis that governs all
17 property interests, held that they were interests in property,
18 in intangible property that were expressed in this chain of
19 wires that were in a sense instructions with regard to debiting
20 and crediting accounts, and those interests in property are
21 properly attached.
22         That was the ruling in the Daccaret case, and it was
23 followed in Winter Storm by the Second Circuit.  Daccaret in
24 turn followed earlier law in the Second Circuit and I followed
25 that in Navalmar as well.  So that there are interests in
            SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

19

92JFRUXA
1  property that are involved in the wire transfers.
2          I also will note that 31 CFR 538.201, which constitute
                           Page 9

92JFRUXA

3   part of the Sudanese sanctions regulations under which the wire
4   transfers were originally blocked provides, in subsection A,
5   except as authorized by regulations, orders, directives,
6   rulings, instructions, licenses or otherwise, no property or
7   interests in property of the government of Sudan that are in
8   the United States that hereafter come within the United States
9   or that are or hereafter come within the possession or control
10  of U.S. persons, including their overseas branches, may be
11  transferred, paid, exported, withdrawn or otherwise dealt, and
12  these clearly are interests in property, either in the United
13  States or coming within the possession or control of U.S.
14  persons. So this is another reason for this argument of
15  preemption that I ruled in favor of.
16          I believe and rule that the interests are interests in
17  property that properly may be attached or sequestered or
18  blocked, and here we have the blocking and that the procedure
19  carried out by you and the other parties pursuant to my orders
20  that you recited at the outset were guaranteed to assure that
21  the interests that are blocked are beneficially owned by the
22  government of Sudan or its agencies or instrumentalities and
23  not by private people. That was the whole point of the
24  procedures that we developed, all of this consensually, which I
25  ordered to protect against this blocking, this sweeping into it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

20

92JFRUXA

1   any private interests.
2           I think to the maximum feasible extent we have assured
3   ourselves that there are no outstanding adverse interests that
4   are not Sudanese. Furthermore, you've represented to me that
5   anywhere that there is an objection, you have excluded from
6   your province, so the turnover order will apply only where
7   there are no objections to the wired funds.
8           MR. HALL: Yes, sir.
9           THE COURT: And your order will make that clear.
10          There are many more entities that are involved and
11  many more accounts that have wired funds than were before.
12  They include, and not to the exclusion of others, American
13  Express Bank, Bank of New York Mellon, Citibank, Deutsche Bank,
14  HSBC Bank, USA, JPMorgan Chase, and probably others.
15          MR. HALL: Yes, your Honor. Federal Reserve.
16          THE COURT: And Federal Reserve. Is there anyone who
17  wants to state an objection? The United States government I
18  think wants to make a point here.
19          MR. JONES: Yes, your Honor, there are several points
20  we'd like to get a chance to air.
21          THE COURT: And this is Mr. Jones.
22          MR. JONES: Yes, your Honor. Is this an appropriate
23  time, your Honor?
24          THE COURT: It is. You can do it from your seat, if
25  you like, Mr. Jones, as long as your voice carries.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

21

92JFRUXA

1           MR. JONES: There's no microphone, so if I'm not
2   audible, please don't let me know.
3           THE COURT: No, there's just an appearance of a
4   microphone.
5           MR. JONES: Near me.
6           Thank you, your Honor. May it please the Court.
7   Again, I'm David Jones with the United States Attorney's

Page 10

92JFRUXA

8   office.
9           THE COURT:  Can Mr. Jones be heard throughout the
10  room?  We can get you a mike there if you need, but you don't
11  need it.
12          MR. JONES:  Thank you.
13          With the Court's permission, I'd like to first make a
14  few general comments about this case and the government's role
15  in it, which, as I stated at the outset as a non-party, but a
16  non-party with a very substantial interest in the resolution of
17  this case, because of the United States's role in administering
18  the sanctions program that forms the backdrop against which all
19  this unfolds.
20          THE COURT:  And I would add that the claimants are
21  survivors of sailors aboard the USS Cole, sailors of the U.S.
22  armed forces, protecting all of us.
23          MR. JONES:  Your Honor, throughout this case we've
24  been intensely aware of that.  TRIA cases necessarily present
25  U.S.-based victims of heinous terrorist acts, and are both

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

22

92JFRUXA

1   sympathetic and deserving of the utmost respect and that's all
2   the more true, given what your Honor just observed, that these
3   are service members who were --
4           THE COURT:  In a time of peace.
5           MR. JONES:  Absolutely.
6           THE COURT:  There were no belligerents at that time.
7           MR. JONES:  That is absolutely correct, your Honor, I
8   remember it well and all the government players here remember
9   it well and share in the condemnation of the act and in the
10  desire to see petitioners get properly compensated.
11          THE COURT:  And indeed, it was the interests of
12  Congress to make an exception to foreign immunity where there
13  are acts of terrorism for the very purpose of protecting United
14  States claimants, United States citizens who have lost their
15  lives and been injured by acts of terrorism.  It's the very
16  purpose that brings us here.
17          MR. JONES:  That is also absolutely correct, your
18  Honor, and something we fully recognize.  So what we are
19  interested in doing is not in any way frustrating the legal
20  entitlements under TRIA of these petitioners or anyone else.
21          THE COURT:  TRIA, we shouldn't use mnemonics.
22          MR. JONES:  I told the reporter.  Terrorism Risk
23  Insurance Act.  Thank you, your Honor.
24          So the nature of the United States's interest is not
25  as we conceive it adverse to these petitioners at all, but what

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

23

92JFRUXA

1   we want to do is insure that these two somewhat complicated
2   regimes interact correctly.  I have to say as I heard your
3   Honor's comments which may have been a ruling, hopefully
4   subject to hearing from us --
5           THE COURT:  It's a provisional ruling.
6           MR. JONES:  That we do have some concerns and would
7   like to air them out.  First, I'd like to spell out the ways
8   that we are not in any way standing in the way of petitioner's
9   recovery here, because I don't want that to be lost in the
10  discussion.  We are taking no position -- well, we certainly
11  acknowledge these are fully eligible claimants under TRIA,
12  under the statute, who are entitled to recover from the assets

Page 11

92JFRUXA

13  of Sudan, which is a terrorist party.  Our position on
14  condemning Sudan and its actions is very clear, and we in no
15  way dispute their entitlement to recover from the assets of
16  Sudan under this statute.  So what we are trying to do is
17  insure that TRIA is correctly applied.
18        A couple of other issues I want to be clear that we're
19  not taking any issue with respect to.  One is that we are not
20  taking a position on the preemption issue that your Honor just
21  articulated as a categorical matter.  We note that the Second
22  Circuit's Smith decision which we referenced in our statement
23  of interest, did conceive of petitioners or plaintiffs
24  recovering under the TRIA statute as proceeding under Rule 69
25  and its incorporation of state law and that might give rise to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

24

92JFRUXA

1  an argument that the UCC remains in play, but we're not
2  advancing that argument.  That's simply not a --
3        THE COURT:  That's not a tenable position either, in
4  my opinion.  The fact that federal judgment enforcement
5  procedure codified in Rule 69 of the Federal Rules of Civil
6  Procedure chooses to take a more developed procedural posture
7  in state law and incorporate it does not mean that the
8  substantive state law is necessarily incorporated as well, and
9  I rule that it is not.  It may be in certain situations, but
10  not where a federal interest is involved.
11        MR. JONES:  Again, as I say, your Honor, that's not an
12  issue that the government has chosen to mount any opposition or
13  indeed take any position on for purposes of this proceeding.
14        There's been mention of the Federal Reserve Bank and a
15  substantial deposit account held there, and we've not taken any
16  position with respect to the attachability of that.  That we
17  leave for the Court's discretion.  That is, I believe,
18  approximately 2 million of the 7 million in deposit funds that
19  petitioners are seeking to recover here.
20        THE COURT:  I've heard no argument.
21        MR. JONES:  I'm clearing my throat, your Honor, but in
22  a way that I hope demonstrates that we're not as adverse as I
23  think sometimes petitioners might feel that we are to their
24  interests.
25        But getting on to the specific issues as to which the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

25

92JFRUXA

1  government does have a concern.  As your Honor fleshed out,
2  there's roughly 7 million in deposit accounts that drew no
3  objection, and as to those our position is simply that it's for
4  the Court to determine whether petitioners have established
5  Sudanese ownership or ownership by agents or instrumentalities.
6  As of our filing of the statement of interest they have not
7  presented evidence to link ownership of accounts to the
8  accounts they've identified.  They have now done that through
9  the reply paper, so they have addressed that concern and
10  realistically, at least with the 7 million in deposit accounts,
11  although it's the Court's decision not ours, we see no problem
12  with their not advancing any.  Similarly with respect to the
13  wire transfers, as I said, we're not objecting to asserting UCC
14  primacy and the UCC frustrates that, we do note that in the
15  core of our position and concern that TRIA requires that the
16  funds that are attached actually be property of that terrorist
17  party is the statutory wording, meaning owned by Sudan in some

Page 12

92JFRUXA

18  sense.  I can say there's approximately 5 million that the
19  petitioners are seeking --
20          THE COURT:  The word "assets" is used, isn't it?
21          MR. JONES:  Yes.
22          THE COURT:  The word "property" is not used.  "Assets"
23  are used.
24          MR. JONES:  That's correct.  Your Honor, our reading
25  of that, and indeed your Honor's comments also reflected an
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              26

92JFRUXA

1   understanding that assets of that terrorist party necessarily
2   connotes some form of ownership because they are assets of the
3   party.
4           THE COURT:  Well, the trouble with using claims like
5   property in ownership is that they're conclusory and they sweep
6   in within their rubric various more definite interests.  I
7   think it was Edward Hofeld who developed the analysis, the
8   Hofeldian analysis of rights and obligations making up a claim.
9   The fact one has an interest in something qualifies as an
10  asset, even though there may be obligations that deal with that
11  same asset, and they are then obligations or liabilities.  You
12  can have a cooperative apartment in New York, and list it in
13  terms of its value as an asset, even though there is a mortgage
14  on it, and a claim for perhaps debts owed to the cooperative
15  that could be larger than the asset.  And yet you will have the
16  asset on the asset side and the liability on your liability
17  side.  All of which to say that interest in things or
18  intangibles qualify as property, and can be attached as such.
19  That battle was fought in the 1930's and I think the legal
20  jurisprudence that we have now develops rubrics like property
21  in ownership in terms of its subsumed claims and obligations,
22  and the regulations do the same.
23          MR. JONES:  Your Honor, I fully recognize that
24  analysis, and I made a little sweeping gesture to recognize the
25  Hofeldian bundle of property interests concept even as you were
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              27

92JFRUXA

1   speaking, and I do acknowledge that as a reality.
2           Nevertheless, for purposes of TRIA, we recognize that
3   TRIA is left to the administration of the courts, it's not for
4   the executive branch to administer and we fully recognize that.
5           I will say that particularly wire transfers in which
6   Sudan was merely the intended beneficiary raise significant
7   concerns for OFAC and for the government as to whether there is
8   a sufficient property interest held by Sudan in those funds to
9   warrant attachment.  We're not categorically saying it could
10  never be the case.  What we're saying is we ask the Court to
11  proceed on an asset-by-asset basis and determine whether
12  petitioners have made a sufficient showing of the ownership
13  interest present.
14          THE COURT:  Isn't the procedure outlined in the order
15  Mr. Hall just cited intended to accomplish just that;
16  separation?
17          MR. JONES:  It was intended, your Honor.  There was
18  some -- and your Honor, again, I'm treading very carefully,
19  because we are not voicing a categorical opposition.
20          THE COURT:  Let me try to help you in terms of a
21  policy, Mr. Jones.  Historically, blocked funds have been kept
22  in the coffers of the government waiting for some resolution of
                              Page 13

92JFRUXA
23    the overall diplomatic controversy between the United States
24    and some other state.
25              MR. JONES:  Your Honor, if I may, actually, the bank,
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

28

92JFRUXA
1     they're frozen in place, but at the government's instructions
2     or insistence.
3              THE COURT:  In the meanwhile, a claim is filed with
4     the Department of State and at such time as a diplomatic
5     resolution occurs, if ever, those funds are then equitably
6     allocated in terms of the claimants.  That's been the situation
7     in Cuba, with the advent of Castro freezing, nationalizing lots
8     of American interests.  It was the situation with the alien
9     property custodian in World War II, it was the situation with
10    the alien property custodian in World War I.
11             Common names, for example, Bayer is a German company,
12    its assets were frozen during World War II, and the peace
13    treaty with Germany opened that up to American claims and
14    disposition.  So when Congress makes an exception, as it does
15    in TRIA, it means it's not waiting for the ultimate resolution,
16    people who have an interest here and now can proceed if they've
17    been the victims of terrorism to collect on any of these
18    blocked funds, and that's been within the Congressional
19    province and it's part of our law, and so the survivors of the
20    sailors who served on the USS Cole have a right to go in
21    against the Sudanese funds that have been blocked, that is, the
22    funds of Sudan and the agencies and instrumentalities of Sudan.
23    So when you're raising these points, Mr. Jones, you are raising
24    it for the interest of other claimants who have not yet become
25    identified to assure that there may be enough funds for them as
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

29

92JFRUXA
1     well.
2              MR. JONES:  Your Honor, I have several specific
3     responses, if I can, to address implications of what your Honor
4     said.  First off, to start at the end, we are in no way
5     interested in vindicating anybody's interests other than those
6     in the United States.  And I want to make that abundantly
7     clear.  We are here motivated by the need to insure the correct
8     administration and the effectiveness of the sanctions
9     regulations as they intersect with TRIA.
10             Let me be very specific about nature of ownership
11    interests.  If the sanctions world ended tomorrow, what OFAC
12    ordinarily would do with these blocked assets is, blocked wire
13    transfers, is work very hard to identify the originator, the
14    sender, and its working understanding is that that originator
15    is the party who owns the money because ownership stays with
16    the sender until it actually reaches its intended beneficiary
17    and these funds haven't gotten there yet and therefore, in
18    OFAC's mindset, which we recognize may differ from TRIA
19    analysis, the money would flow back to the originator.
20             To state a positive --
21             THE COURT:  I'm not sure that's true.
22             MR. JONES:  I'm saying just as a -- your Honor, I want
23    to be clear.  I'm talking about how OFAC would go about the
24    admin and the unraveling of blocked assets were the blocking to
25    end.  And if -- so that's its baseline understanding of how
                        SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300
                              Page 14

92JFRUXA

30

92JFRUXA
1  they would operate.  It may well be, now, you asked about the
2  absence of objection and whether that doesn't cure
3  everything --
4          THE COURT:  I don't know whether as a matter of
5  commercial law the effort of the originator of wired funds to
6  pay the beneficiary is discharged at the moment that the funds
7  hit the clearing bank.  When it hits the clearing bank there's
8  simultaneously debit and credit and credit and debit, so there
9  is payment, in effect, to the beneficiary.  And the question is
10 when is it blocked.  Is it blocked the moment before the
11 debiting and credit or the moment after?  If it's the moment
12 after, it's the beneficiary's funds that are blocked.  If it's
13 the moment before, it's the originator's funds that are
14 blocked.
15          MR. JONES:  Your Honor, I want to be clear, because
16 I'm not sure what your Honor means by a clearing bank.  The UCC
17 provision is that, or comment actually, I believe, specifically
18 that, which your Honor referred to earlier is that there's no
19 property interest subject to attachment until the funds reach
20 the bank of the intended beneficiary, and there are also UCC
21 provisions saying that the originator's discharge of obligation
22 occurs the moment the credit reaches the beneficiary's bank,
23 and the moment that occurs satisfies the beneficiary of the
24 funds.
25          THE COURT:  That's a matter of New York law.  I don't
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

31

92JFRUXA
1  know whether in a conflict of laws analysis that would be the
2  appropriate law, particularly if I'm holding the federal law
3  preempts New York law.
4          MR. JONES:  Your Honor, federal law preempts, that's
5  right, these wouldn't control, then.  I want to be very
6  clear --
7          THE COURT:  Well, let's move away from this
8  theoretical analysis.  What is the government's interest,
9  Mr. Jones?
10         MR. JONES:  I can answer that two ways.  Does your
11 Honor want a bottom line position of what money does the
12 government think is okay and what doesn't it?
13         THE COURT:  Yes.
14         MR. JONES:  Your Honor, the answer is as to deposit
15 accounts, the government thinks that's fine.  As to wire
16 transfers originated with Sudan -- oh, first off, let me
17 preface, all of this is subject to the understanding that it's
18 your Honor's decision and that the Court has to be satisfied
19 that Sudan or an agency or instrumentality owns the account in
20 issue.  As to deposit accounts, assuming such a determination
21 is made, I think the government has no problem.  We are not
22 taking any categorical position as to wire transfers either
23 originated by Sudan or intended to go to Sudan.  I think
24 realistically we have less concern about transfers originated
25 with Sudan because in our mind, and your Honor may think
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

32

92JFRUXA
1  wrongly or rightly, ownership remains there until the transfer
2  is complete, which hasn't happened, so we think that is a
3  fairly straightforward ownership analysis that makes funds
                            Page 15

92JFRUXA

4    available for petitioner, and then would have the question of
5    funds intended to reach Sudan, which didn't get there, and as
6    to that, I think it's conceivable that there could be a
7    Sudanese ownership interest sufficient to reach TRIA, but I
8    think the Court has to sort of tread carefully and those
9    present difficult issues.  Because as a practical matter, it's
10   hard to say whether that's actually money owned by Sudan.
11   There could be many reasons why the sender got notice of,
12   either didn't get notice of this or chose not to come in to a
13   U.S. court and yet it still could not be funds with the primary
14   direct ownership interest lying with Sudan.
15          So I think some careful analysis is just required
16   there, and again, in the nitty gritty level we're not taking
17   the role of performing that analysis or criticizing
18   petitioner's presentation.  We just note that as an analytical
19   matter it presents real concerns.
20          Let me note as a practical matter we're talking about
21   roughly a half million gap when you talk about the two
22   categories of money to reach the full judgment amount and there
23   are other sources available, not subject to this motion, but
24   I'm told there's another -- if you look at accounts from 20 to
25   $50,000 before the respondent banks, there's another somewhat
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              33

92JFRUXA

1    in excess of a half million, and there's well over a million in
2    additional blocked accounts that were identified by OFAC to
3    petitioners that are not subject to this proceeding.  So there
4    is money out there should the Court make a determination that
5    any of this money is available.  Again, we're not taking the
6    categorical position that the money sought can't be --
7             THE COURT:  I take your point, Mr. Jones.
8             MR. JONES:  But we wanted just some backup.
9          I think the other point I should address, your Honor,
10   the other significant topic that's come up that I should
11   address is payment for the banks' legal fees and costs.  Of
12   course unless the Court would like me to address anything else.
13   We didn't address that because that request came in in the
14   bank's responses to the turnover motion which was
15   essentially --
16             THE COURT:  What's your suggestion?
17             MR. JONES:  I'm sorry?
18             THE COURT:  What's your suggestion?
19             MR. JONES:  Your Honor, we would have no problem with
20   something petitioners would vehemently object to, I know, that
21   whatever costs and expenses are appropriate should come out of
22   petitioner's recovery in the Court's discretion.
23             THE COURT:  That's not usually done in judgment
24   creditors turnover proceedings.
25             MR. JONES:  Your Honor, this really -- your Honor, I
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                              34

92JFRUXA

1    have to -- let me -- I have to be careful about my
2    institutional authority, because our appearance here was
3    authorized by the Assistant Attorney General, to say what we
4    said and this raises a new question.  we've done some internal
5    thought and I know OFAC has some very grave concerns about this
6    and might ask us to come in for a second bite at the apple, so
7    if I may, let me just articulate the analysis but make clear
8    that I haven't been authorized to formally object to the
                           Page 16

92JFRUXA

9   application at this point.
10          I could seek and get clarification after the fact.
11          THE COURT:  Maybe you should.  But I can see your
12   point.
13          MR. JONES:  Okay.
14          THE COURT:  Because most of the times the successful
15   suitor must absorb his own costs.  In the judgment creditor
16   field in New York practice, it's typically the debtor or where
17   the funds are located that absorbs the costs and the judgment
18   creditor takes whole.  Indeed, if the judgment creditor has to
19   use a sheriff to collect, which is the way it's done in New
20   York practice, the sheriff's poundage is on top, and the amount
21   that's recovered adds 5 percent for the sheriff's poundage, and
22   I think that same practice is done when the marshal recovers
23   funds in federal enforcement judgment proceedings.
24          MR. JONES:  Well, your Honor, what this really goes to
25   is whether this case is fundamentally an interpleader action or

92JFRUXA

1   a petition for a writ of attachment and to enforce a judgment
2   under TRIA, which is how it was initially brought to this
3   court.
4          THE COURT:  Well, the procedure becomes amalgamated in
5   New York.  I've had this experience as a judgment creditor
6   seeking funds, and the way banks do it is to notify people who
7   may have an interest in the account so they can come in and
8   defend.  They're the real parties in interest.  That's the
9   procedure I used.
10          MR. JONES:  What I haven't seen here, your Honor --
11   first, let me just say the basic terms of TRIA, which, as we
12   understand it, is the only thing creating an exception to
13   permit enforcement of these funds in light of Sudanese
14   sovereign immunity and also creating an exception with the
15   blocking regulations which otherwise would freeze them.  The
16   terms of TRIA talk only about permitting the judgment holder to
17   recover by attaching those funds.  It doesn't say anything
18   about costs or fees to the holder of those funds, meaning the
19   banks.
20          THE COURT:  But the normal attachment in New York --
21   I'm not sure New York would be the only relevant influence --
22   normal attachment procedure in New York adds the amount of
23   poundage and other costs and expenses of collection, and
24   typically banks will charge their expense against the fund.  So
25   let's say if $10,000 is attached and it's $500 of expense

92JFRUXA

1   involved with the bank, the bank will charge that to his
2   account holder.
3          MR. JONES:  Your Honor, I have sort of a practical
4   idea, which is if -- I haven't seen the banks spell out -- I've
5   seen the banks assert authority under ordinary interpleader
6   principles to back their claims for costs and fees, but I
7   haven't seen the TRIA issue, intersection, really fleshed out
8   by them, nor have we fully engaged in it.  It might be helpful
9   to me and the government, certainly, if we could have a round
10   of briefing on that, and I would couple that with, I happen to
11   know Mr. Hall is very impatient and that his clients have been
12   waiting a long time for their money and a practical suggestion
13   might be an immediate release of at least the 7 million, which

Page 17

92JFRUXA

14   would --
15         THE COURT:  I think the whole amount should be
16   released.  The real question is whether Mr. Hall collects --
17   let me put it this way.  Let's say he had $13 million, so he
18   was short $200,000, and the banks had nothing to go against him
19   to assert their expense.  Well, the banks would probably reduce
20   the amount they turned over and recover their own expense
21   before remitting anything to Mr. Hall.  That's the way it would
22   be done in New York.  And then Mr. Hall would then have a
23   larger deficiency and seek other resources to collect his full
24   judgment.
25         We could do that.  It probably would run by, I think,
               SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                  37

92JFRUXA

1   New York practice.  I don't think it's as equitable a procedure
2   as the one I suggested, because the procedure then would focus
3   on the money he's collected and impact that money only, giving
4   a windfall in a distributive equity sense to other people that
5   are just as liable and whose money has not been touched.  So
6   that was the reason, and is my rationale, that the bank should
7   charge on an equitable basis all parties and accounts affected
8   by this procedure, not only those that are being turned over to
9   Mr. Hall.
10        I think that's a better way to do it.  But I haven't
11   really thought this through and I don't know the relationship
12   with OFAC.  I think as a matter of equity I should do that.
13   But the primary interest is Mr. Hall's clients and those are
14   the people that the law protects, and I will rule that they
15   should go first.
16        MR. JONES:  Your Honor, I just consulted with my
17   colleague, Mr. Klopper, to see if I was forgetting anything.
18   The answer is largely no.  But I do want to say that this case
19   has caused a lot of intense thought on the part of a lot of
20   people within the government because it presents novel and
21   important issues, including the importance of the interests of
22   petitioners, as well as how it intersects with our programs.
23   And so in light of that, what I very much would hope is
24   whatever effective date of whatever order comes into place
25   would just give the government sufficient time to consult, see
               SOUTHERN DISTRICT REPORTERS, P.C.
                  (212) 805-0300

                                                  38

92JFRUXA

1   if we want to make any further submission to the Court, and
2   determine whether there's anything we're apt to want to appeal.
3   That of course would require solicitor general approval.
4         THE COURT:  How much time?
5         MR. JONES:  I mean, I don't want to delay things
6   unduly.
7         THE COURT:  30 days?
8         MR. JONES:  30 days would be great, your Honor.
9         THE COURT:  Mr. Hall?
10       MR. HALL:  That's acceptable, your Honor.
11       MR. JONES:  I appreciate it, your Honor, and Mr. Hall.
12       THE COURT:  From the date of entry of the order.  The
13   banks would not be turning over funds.  What about the money
14   that's left over, what do I do with it?
15       MR. JONES:  Oh, yes, your Honor.  That needs to just,
16   in our view needs to flow back to the banks from which it came,
17   so whichever specific accounts were enforced against --
18       THE COURT:  And the order will provide, the order will
                      Page 18

92JFRUXA

```
19   provide for that as well, folks?
20           MR. HALL:  Your Honor, just as a practical matter --
21           THE COURT:  I don't know if Mr. Jones is finished.
22           MR. JONES:  It's fine, I'm sorry, your Honor, I should
23   say that probably technically, they remain blocked and OFAC
24   probably will need to issue a license to restore that status
25   quo and it will do so.  We'll just work out the logistics of
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                39

92JFRUXA
```
 1   that.
 2           THE COURT:  That will be in the order as well,
 3   Mr. Jones?
 4           MR. JONES:  Yes, we're happy to just have a provision
 5   saying --
 6           THE COURT:  Could I return it subject to the blockage?
 7           MR. JONES:  Actually, I have an OFAC observer here, I
 8   can ask quickly what he would prefer, if the Court would like.
 9           THE COURT:  Who is that OFAC observer?
10           MR. JONES:  Peter Chessik.
11           THE COURT:  Sir, would you rise, give your name to the
12   reporter if you'd like, and give your advice.
13           MR. CHESSIK:  Peter Chessik, Department of Treasury,
14   counsel for OFAC.  I think OFAC's preference would be to issue
15   a license for the return of those funds.  Generally, blocked
16   funds don't move anywhere without OFAC's say-so.
17           THE COURT:  Could that be in the same order?
18           MR. CHESSIK:  I think that would probably be fine.
19           THE COURT:  Okay, so you'll contribute to working out
20   the right provisions.
21           MR. JONES:  Other than that, your Honor, if you have
22   no further questions.
23           THE COURT:  No, I have no further.  Thank you very
24   much.
25           MR. HALL:  I'm compelled to observe in practicality
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                                40

92JFRUXA
```
 1   I'm not sure we have in practical terms any issue with anybody.
 2           THE COURT:  I don't think there is any issue.  In
 3   answer to what Mr. Jones is telling me, I have given very
 4   careful analysis to the issue of the wire transfers, and I
 5   believe that my ruling given provisionally is the correct rule,
 6   and I would make it absolute at this time.
 7           There are interests in those funds.  It's the same,
 8   really, it's the same analysis as a deposit.  If I have a
 9   deposit of $100 in JPMorgan Chase, there's no hundred dollar
10   bill lying around somewhere in the bank, or five twenties lying
11   around somewhere in the bank that my creditor can attach.  I
12   have a credit in Chase.  Chase has a debit corresponding to my
13   claim.  I would claim on Chase for $100 and Chase has an
14   obligation to me for $100 as a depositor.
15           I think it's the same thing with regard to the wire
16   transfer.  The clearing bank, that is, the bank that moves the
17   funds from one source to another, has a debit in favor of the
18   originator.  The originator has a claim against the bank in the
19   same way as a depositor, and it gives an instruction.  It gives
20   an instruction that that amount of money as to which it has a
21   claim should be paid to somebody else, the beneficiary.  The
22   beneficiary also has an account typically at the clearing bank,
23   so the bank adjusts the debits and credits and the credits and
```
                                Page 19

92JFRUXA

24  debits to make the transaction, and that's what it is.  The
25  wire doesn't carry money.  The wire is an instruction to the

41

92JFRUXA
1  clearing bank, and an instruction to pay is translated by the
2  banker just as an accountant would do it, into debits and
3  credits.
4          That's why I thought that the official note to the
5  UCC, although perhaps useful in terms of an analysis under
6  state law, did not really change the preemption analysis.  The
7  preemption analysis is focused on assets and interests, and it
8  seems to me it's much the same, if not identical to the
9  situation of a depositor.
10         Anyway, those are my rulings.  I think, Mr. Hall, you
11  can now go to the next stage of these proceedings of drafting
12  an order within 30 days from the signature would get the money
13  to the survivors of the unfortunate sailors who lost their
14  lives on the USS Cole.
15         MR. HALL:  On their behalf, your Honor, we thank you.
16         MR. BERRY:  May I just raise one question that relates
17  to the expenses, the fees and expenses.
18         THE COURT:  Yes, sir.
19         MR. BERRY:  I'm not sure if your Honor has made a
20  final ruling with respect to that.
21         THE COURT:  I have, but that's the way I want to rule,
22  but Mr. Jones can under a motion of reconsideration give me
23  more thought on that.  We can adjust.  There are two interests
24  involved here.  I'm looking to you to work it out.  The primary
25  interest is Mr. Hall's clients.  The secondary interests are

42

92JFRUXA
1  the expenses that have been incurred by the bank because of the
2  relationship of the bank with its account holders.  Typically
3  the bank will charge for its expenses, and I believe that they
4  should be able to liquidate those charges.
5          MR. BERRY:  Well, your Honor, I think in fairness, a
6  third interest is the interests of those such as my client,
7  Nordea Bank of Finland, which is a claimant to the funds and
8  who believes that it has shown clearly that none of the wires
9  were either originated by or intended to be sent to the
10  government of Sudan, and they find that not only have they had
11  to incur the expenses of presenting their claims so that they
12  had valid objections here, but as I understand your Honor's
13  ruling, the funds will now be returned to the OFAC blocked
14  accounts at, in this case JPMorgan Chase, but there will be a
15  diminution in those funds by virtue of their participation
16  here.  And it seems to me that it would be fairer, at least in
17  this instance, not to charge claimants such as our client with
18  the expense of this proceeding, but to --
19         THE COURT:  Your argument is that I'm wrong by saying
20  that where there are objections, those accounts should be
21  charged as well.  Thus you're saying that if I were a
22  successful objector, I wouldn't be charged with a cent.  And so
23  the burden of the charge should be on those funds that are
24  turned over.
25         MR. BERRY:  That's correct, your Honor.

43

92JFRUXA

92JFRUXA
```
 1          THE COURT:  Anybody else?
 2          MR. KEATING:  Your Honor, John Keating.  I represent
 3   KFW Bank.  We're in this exact same position.  Our view is our
 4   funds should not have been blocked in the first place, much
 5   less turned over to anyone else.
 6          THE COURT:  I think the rule, then, should be that the
 7   banks will assert their claims for the funds they're turning
 8   over, and turn over so much more -- I would advise they need to
 9   assert their claims to the funds they would turn over.  If
10   there are sufficient funds in the account to turn over
11   entirely, they should turn over entirely.  If they have to
12   reduce the amount that Mr. Hall is entitled to recover because
13   of those expenses, then I guess it's reduced and Mr. Hall has
14   to get more money from some other source and maybe I'll have to
15   reserve jurisdiction with regard to the blocked accounts and
16   wire transfers where there are objections, I may have to rule
17   on the objections.
18          MR. HALL:  The fact of the matter is, we have about a
19   million over the judgment in unobjected to money.
20          THE COURT:  Should be enough.
21          MR. HALL:  Which, hopefully, is enough.
22          THE COURT:  Should be enough.  So let that be the
23   revised ruling.
24          MR. BERRY:  Thank you, your Honor.
25          THE COURT:  That the banks will then assert their
```

92JFRUXA
```
 1   charges to the blocked accounts that are being turned over and
 2   blocked wire transfers that are being turned over.  Mr. Hall,
 3   you may hold to the extent there are funds, if there are no
 4   funds, I'll then worry about the objections.
 5          MR. HALL:  Thank you, your Honor.
 6          THE COURT:  All right.  So this has to all be worked
 7   out in the order, and if there are problems, let me know and
 8   I'll convene another hearing, we'll take other submissions.
 9          MR. GIMBEL:  Your Honor, if I may, one question or
10   point of clarification, one housekeeping matter.  The question
11   is, as you know, the banks have applied for a discharge order
12   discharging them from liability with respect to any accounts
13   that ultimately are turned over.  Would your Honor like that to
14   be part of the single proposed order?
15          THE COURT:  I do think so, yes.
16          MR. GIMBEL:  Thank you.  And the housekeeping matter
17   is that we submitted a catalog of objections to the Court in
18   accordance with the Court's order.  I understand that we were
19   not able to file it because it is a letter and letters may not
20   be filed.
21          THE COURT:  If you ask me by letter for permission to
22   file, I'll grant it.
23          MR. GIMBEL:  Thank you very much, your Honor.
24          THE COURT:  Is there anything else?
25          MR. HALL:  Not for the petitioner.
```

92JFRUXA
```
 1          THE COURT:  I think we stand adjourned, then, and I
 2   thank you all for excellent submissions and excellent
 3   presentation.
 4          MR. HALL:  Thank you, your Honor.
```

92JFRUXA

5    (Adjourned)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300