# REPORT TO CONGRESS
# January 2009



EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS
WITH RESPECT TO SUDAN

EXHIBIT

OFFICE OF FOREIGN ASSETS CONTROL

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

## TABLE OF CONTENTS

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  SUMMARY OF CURRENT SANCTIONS WITH RESPECT TO SUDAN . . . . . 2

III. ELEMENTS OF CURRENT SANCTIONS ADMINISTERED BY OFAC  . . . . . 4

IV.  EFFECTIVENESS OF U.S. SANCTIONS AGAINST SUDAN  . . . . . . . . . . . 7

V.   U.S. GOVERNMENT EFFORTS TO MITIGATE THE EFFECTS
     OF SANCTIONS ON SOUTHERN SUDAN . . . . . . . . . . . . . . . . . . . . . . . . 11

VI.  ACHIEVING MULTILATERAL SANCTIONS AGAINST SUDAN. . . . . . . . . . 12

VII. CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ANNEX I: SPECIALLY DESIGNATED NATIONALS LIST – SUDAN  . . . . . . . . 15

ANNEX II: EXECUTIVE ORDERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ANNEX III: EXAMPLES OF CIVIL PENALTIES. . . . . . . . . . . . . . . . . . . . . . . . 31

ANNEX IV: AGGREGATED ANNUAL IEEPA REPORT DATA . . . . . . . . . . . . . 32

ANNEX V:  COMPARISON OF U.S. WITH UN AND EU SANCTIONS
          ON SUDAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

# Effectiveness of U.S. Economic Sanctions With Respect to Sudan

## I.  INTRODUCTION

For over a decade, the U.S. Department of the Treasury ("Treasury") has administered economic sanctions in response to the national emergency, first declared by President Clinton and renewed and expanded by President Bush, caused by the policies and actions of the Government of Sudan (the "GOS"). These include the GOS's support for international terrorism, efforts to destabilize neighboring governments, and perpetration and sponsorship of pervasive human rights violations in South Sudan and, more recently, in the Darfur region. The precise impacts of any sanctions program are difficult to isolate and quantify. Nevertheless, Treasury assesses that financial sanctions have had a marked effect on the decision-making of the GOS, and have provided useful leverage to advance U.S. foreign policy in Sudan. Treasury also assesses that U.S. sanctions are being implemented with great fidelity by the U.S. private sector, by non-U.S. companies, and beyond our borders.

It should be remembered that a sanctions program is but one part of a larger foreign policy toolkit, and any assessment of the effectiveness of sanctions must consider the sanctions in their proper role as an instrument of foreign policy, not as the complete expression of that policy.

### Congressional Reporting Requirement

The Sudan Accountability and Divestment Act of 2007 (the "SADA"), Pub. L. No. 110-174, section 10(b), requires the Secretary of the Treasury to provide a report "assessing the effectiveness of sanctions imposed with respect to Sudan" under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706. This report benefited from consultations with the State Department, the Commerce Department, the U.S. Agency for International Development, other concerned agencies, and relevant senior U.S. government officials.

In accordance with the reporting requirements set forth in section 10(b) of the SADA, this report includes:

1.  a description of each sanction imposed under a law or Executive order;

2.  the name of the person subject to the sanction, if any; and

3.  whether or not the person subject to the sanction is also subject to sanctions imposed by the United Nations.

More generally, this report takes a holistic approach to assessing the effectiveness of sanctions, moving beyond quantified accountings of blocked assets and disrupted transactions. The report does not address the possible costs of sanctions to the United States or U.S. persons.[1]  In

---

[1]   Section 3(c) of E.O. 13400 and Section 6(c) of E.O. 13412 define the term "United States person" to mean "any U.S. citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States."

addition, the discussion of sanctions in this report is limited to those sanctions imposed by Treasury under IEEPA and therefore does not include measures enforced by other Executive or state-level agencies, such as visa or export sanctions implemented by the State Department.

## II.  SUMMARY OF CURRENT SANCTIONS WITH RESPECT TO SUDAN



Executive Order 13412 of October 13, 2006

The United States has maintained economic sanctions against Sudan under IEEPA since 1997.  In Executive Order 13067 of November 3, 1997 ("E.O. 13067"), President Clinton imposed trade sanctions and blocked all property and interests in property of the GOS that are within the United States or in the possession or control of U.S. persons.  In doing so, he cited the policies and actions of the GOS, including support for international terrorism, efforts to destabilize neighboring governments, and involvement in pervasive human rights violations.  When E.O. 13067 was issued in 1997, Sudan had already been designated as a State Sponsor of Terrorism by the United States, and it was subject to the foreign assistance and other restrictions that result from that designation as well as limited U.N. diplomatic and travel sanctions.  According to the State Department's 2006 Country Reports on Terrorism, over the years following the imposition of IEEPA sanctions, the GOS showed an increased willingness to cooperate with the United States on counterterrorism issues.  The North-South conflict moved fitfully toward resolution over years of negotiations in Machakos and Naivasha, Kenya, culminating with the GOS and the Sudan People's Liberation Movement/Army (SPLM/A) signing, with Secretary of State Colin Powell as an official witness, the Comprehensive Peace Agreement on January 9, 2005.  On the other hand, as the North-South negotiations neared conclusion, the crisis in Darfur escalated.

On April 26, 2006, President Bush expanded the scope of the Sudan sanctions by issuing Executive Order 13400 ("E.O. 13400") to block all property of persons determined to be contributing to the conflict in Darfur.  On October 13, 2006, President Bush issued Executive Order 13412 ("E.O. 13412") to implement the Darfur Peace and Accountability Act of 2006 ("DPAA").  Among other things, the DPAA calls for support of the Government of Southern Sudan ("GOSS"), assistance for the peace efforts in Darfur, and the provision of economic assistance in specified areas of Sudan.  E.O. 13412 continues the comprehensive blocking of the property and interests in property of the GOS, but it removes the GOSS from the definition of the GOS and exempts certain specified areas of Sudan from most of the sanctions.  E.O. 13412 also prohibits all transactions by U.S. persons relating to petroleum or petro-chemical industries in Sudan, including but not limited to oil, oilfield services, and oil or gas pipelines.  These prohibitions, like the blocking of GOS property, apply in all areas of the country.

### A.   *Authorities Set Forth by Executive Order 13067*

Pursuant to E.O. 13067, absent specific authorization from Treasury's Office of Foreign Assets Control ("OFAC"), all property and interests in property of the GOS that are in the United States, that come within the United States, or that are or come within the possession or control of U.S. persons, including their overseas branches, are blocked.

- Absent specific authorization from OFAC, the following are prohibited:
    - the importation into the United States of any goods or services of Sudanese origin, other than information or informational materials;
    - the exportation or reexportation, directly or indirectly, to Sudan of any goods, technology (including technical data, software, or other information), or services from the United States or by a U.S. person, wherever located, or requiring the issuance of a license by a Federal agency, except for donations of articles intended to relieve human suffering, such as food, clothing, and medicine;
    - the facilitation by a U.S. person, including but not limited to brokering activities, of the exportation or reexportation of goods, technology, or services from Sudan to any destination, or to Sudan from any location;
    - the performance by any U.S. person of any contract, including a financing contract, in support of an industrial, commercial, public utility, or government project in Sudan;
    - the grant or extension of credits or loans by any U.S. person to the GOS;
    - any transaction by a U.S. person relating to transportation of cargo to or from Sudan; the provision of transportation of cargo to or from the United States by any Sudanese person or any vessel or aircraft of Sudanese registration; or the sale in the United States by any person holding authority under subtitle 7 of title 49, United States Code, of any transportation of cargo by air that includes any stop in Sudan; and
    - any transaction by any U.S. person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth above.

### B.   *Authorities Set Forth by Executive Order 13400*

E.O. 13400 blocks the property and interests in property of persons specified in the annex to that order and of persons determined by the Secretary of the Treasury after consultation with the Secretary of State to:

- have constituted a threat to the peace process in, or stability of, Darfur;
- be responsible for conduct related to the conflict in Darfur that violates international law;
- be responsible for heinous conduct with respect to human life or limb related to the conflict in Darfur;

- have supplied, sold, or transferred arms or any related materiel, or assistance, advice, or training associated with military activities to the warring parties in Darfur;

- be responsible for offensive military overflights in and over the Darfur region;

- have materially assisted or supported, or to have acted for or on behalf of, any of the above; or

- be owned or controlled by, or act or purport to act for or on behalf of, directly or indirectly, any person listed in the annex or designated under E.O. 13400.

**C.   *Authorities Set Forth by Executive Order 13412***

- E.O. 13412 contains the following prohibitions:

  O Maintains the countrywide blocking of the property and interests in property of the GOS imposed by E.O. 13067; and

  O Prohibits all transactions by U.S. persons relating to Sudan's petroleum or petro-chemical industries, including, but not limited to, oilfield services and oil or gas pipelines.

- It contains the following exemptions:

  O Excludes the GOSS from the definition of the GOS; and

  O Exempts from the prohibitions in section 2 of E.O. 13067 specified areas of Sudan: Southern Sudan, Southern Kordofan/Nuba Mountains State, Blue Nile State, Abyei, Darfur, and marginalized areas in and around Khartoum. Trade and humanitarian assistance are no longer prohibited in the exempt specified areas, provided that these activities do not involve Sudan's petroleum or petro-chemical industries or any property or interests in property of the GOS.

## III. ELEMENTS OF CURRENT SANCTIONS ADMINISTERED BY OFAC

### A.   *Blocking and Prohibiting Transactions*

Absent a license or other authorization, U.S. persons may not engage in commercial transactions with the GOS and are required to block any property or interests in property of the GOS and any targeted individuals or entities that come into the U.S. persons' possession or control. Blocking, also referred to as "freezing," imposes broad prohibitions against transfers or dealings of any kind with regard to targeted property. Violations of these prohibitions can carry stiff civil and criminal penalties.

OFAC maintains a "List of Specially Designated Nationals and Blocked Persons" ("SDN List"), which includes the names and identifying information of individuals and entities whose property and interests in property are blocked pursuant to all sanctions programs administered by OFAC. The SDN List includes 170 individuals and entities whose property and interests in property are blocked pursuant to the Sudan sanctions program.[2]

---

2     See Annex I for a complete listing of Sudan designations to date.

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

> **EXAMPLE OF SDN LISTING**
>
> *GIAD MOTOR COMPANY (a.k.a. GIAD MOTOR INDUSTRY COMPANY LIMITED), Basheer*
>
> Mohammad Saeed Building, Baladia Street, P.O. Box 13610, Khartoum, Sudan; Website www.giadmotors.com (Sudan) [SUDAN]

In a major targeted sanctions action, on May 29, 2007, President Bush announced the designations of three Sudanese individuals and thirty-one Sudanese companies. The three designated individuals include two senior GOS officials designated for facilitating and contributing to violent attacks in Darfur. Their actions included planning attacks and providing logistical support to the Janjaweed militia. The third individual is a leader of one of the rebel groups, the Justice and Equality Movement ("JEM"), which has been responsible for a number of violent incidents and which refused to sign the Darfur Peace Agreement. Treasury designated Azza Air Transport, an air cargo firm, because it is a mainstay of the GOS's resupply efforts for its forces in Darfur. The other 30 companies were designated pursuant to E.O. 13067 and E.O. 13412 because they are owned or controlled by the GOS. These companies include five petrochemical companies, as well as Sudan's national telecommunications company, Sudatel.

## B.   Trade Controls

E.O. 13067 imposed – and E.O. 13412 continued with certain exemptions – a broad trade embargo on Sudan. These trade sanctions prohibit imports into the United States of most goods or services of Sudanese origin. Absent authorization from OFAC, they also prohibit exports or reexports to Sudan of any goods, technology, or services from the United States or by a U.S. person. Humanitarian donations are an exception to these export restrictions. U.S. persons are also prohibited from executing any contract that supports an industrial, commercial, public utility, or government project in Sudan, or from making any investment in the GOS. There are also broad prohibitions in place for most transactions relating to the transportation of cargo to or from Sudan, or to the United States by a Sudanese person or vessel.

## C.   Compliance

Treasury takes a number of steps to promote meaningful private sector implementation of sanctions on Sudan. These include:

- ■ An active outreach program that works closely with relevant business sectors, including banking, securities, insurance, and the import/export community, and over one hundred workshops each year to foster greater understanding of OFAC sanctions;

- ■ A central and easily accessible listing of all SDNs, including clear and detailed identifiers (information included on the SDN List that identifies the particular individual or entity listed, such as address and date and place of birth);

- ■ Effective and prompt electronic dissemination of information on sanctions changes and announcements of new designations to all affected parties;

- ■ Several fora for addressing the questions and concerns of financial institutions and others, including brochures in plain English explaining the prohibitions; the OFAC website [www.treasury.gov/ofac]; the OFAC telephone hotline; the OFAC e-hotline; and OFAC electronic notification services; and

■ Reporting procedures and regulations that set forth what transactions are prohibited and when U.S. persons must notify OFAC that a financial transaction has been rejected or that property in which the GOS has an interest has been blocked.

In addition to its outreach program, OFAC works closely with federal and state regulators in high-risk sectors to ensure that regulated private sector entities have adequate controls in place to comply with OFAC regulations.

### D.   Licensing Authorities

Treasury has exercised its licensing discretion, in consultation with the State Department, to generally authorize a number of categories of Sudan-related transactions. The provision of humanitarian goods such as food and medicine are generally authorized, including humanitarian transshipments through non-exempt areas to or from Southern Sudan or Darfur. Generally authorized Sudan-related transactions also include certain imports for diplomatic or official personnel; the importation and exportation between the United States and Sudan of diplomatic pouches and their contents; certain transactions related to patents, trademarks, and copyrights; and certain non-commercial, personal remittances. Treasury also issues specific or individual licenses on a case-by-case basis to support U.S. foreign policy, such as licenses authorizing transactions by non-governmental organizations (NGOs). The exemptions in E.O. 13412 with respect to the Specified Areas of Sudan have facilitated the ability of NGOs to operate there without the need for OFAC licenses.

On July 12, 2001, OFAC amended the Sudanese Sanctions Regulations, 31 C.F.R. part 538 ("SSR"), to implement the Trade Sanctions Reform and Export Enhancement Act of 2000 ("TSRA"), Title IX, Pub. L. No. 106-387. These regulations amend the licensing provisions of the SSR to allow the exportation and reexportation from the United States or by U.S. persons of agricultural commodities, medicine, or medical devices to Sudan under specific licenses issued by OFAC.[3]

### E.   Enforcement and Civil Penalties

An effective system of enforcement is an important part of OFAC's implementation of Sudanese sanctions. Enforcement and civil penalties help to raise awareness of Treasury sanctions programs in the private sector and can act as a deterrent to potential violators. Over the past several years, OFAC has closed a number of civil penalty cases related to Sudanese sanctions.[4] In one case, for example, a U.S. carrier paid $37,500 to settle an allegation that it had engaged in a transaction involving the transportation of cargo from Port Sudan to Amsterdam in May 2006, in violation of the SSR. In addition to remitting the civil penalty, the carrier also implemented improvements to its OFAC compliance program.

In 2007 Congress passed the International Emergency Economic Powers Enhancement Act, signed into law by President Bush on October 16, 2007, which increased the maximum civil

---

3   The DPAA and E.O. 13412 both exempt Specified Areas of Sudan, including Southern Sudan and Darfur, from certain economic sanctions set forth in E.O. 13067. However, these exempted areas currently remain subject to licensing requirements set forth in TSRA because the territory is within Sudan. TSRA creates the unintended result of requiring an OFAC license to export agricultural and medical items to the exempted areas of Sudan even though no OFAC license is ordinarily required to export other items to the same areas.

4   See Annex III for examples of civil penalties assessed.

penalty applicable to violations of orders or regulations issued under IEEPA, in part to allow OFAC to respond more meaningfully to serious violations of Sudanese sanctions. The fines are now capped at $250,000, or twice the amount of the violative transaction, whichever is greater. The Enforcement Division is pursuing a number of significant investigations involving apparent violations of the Sudan sanctions, especially involving the petroleum and shipping industries. Although these cases are still being processed, they have the potential to result in substantial civil monetary penalties against persons that have violated U.S. sanctions against Sudan.

## IV. EFFECTIVENESS OF U.S. SANCTIONS AGAINST SUDAN

The ultimate objective of sanctions is behavioral change. With the GOS's continued intransigence on the deployment of UNAMID peacekeepers, access by humanitarian relief groups to Darfur, and persistent eruptions of violence in Darfur and along the North-South border, central U.S. policy goals of stability and peace have not yet been secured and sanctions remain in place. Short of this ultimate objective, however, the most meaningful measure of a sanctions program is whether and to what extent it is exerting pressure on relevant decision makers such that it affects their behavioral calculi. That said, it can be notoriously difficult to measure regime thinking and attribute the impact of sanctions. Even when regime-level behavioral changes do occur, it is difficult to identify the precise role that sanctions might have played in bringing about such changes.

This report concludes that U.S. sanctions against Sudan have applied constructive pressure that has affected key Sudanese officials' decision-making calculi. This pressure, along with other sources of pressure exerted by the U.S. government, has served to advance the primary goals of U.S. policy toward Sudan. At times, the impact of sanctions is best revealed in classified reporting. The form of this report precludes discussion of such information here. But the tenor of such reporting is broadly consistent with the strengths and limitations discussed in this report.

Despite the constraints described above, the following sections lay out the principal measures of effectiveness of U.S. economic sanctions against Sudan, specifically (1) quantifiable markers; (2) changes in behavior by the GOS; and (3) economic impact.[5] In later sections, this report also describes U.S. government efforts to mitigate the impact of sanctions on Southern Sudan, and concludes with a discussion of current multilateral sanctions against Sudan.

### A. Quantifiable Markers

Treasury reports on its Sudan sanctions program in part through semi-annual reports to Congress, submitted pursuant to section 204(c) of IEEPA, 50 U.S.C. 1703(c), section 401(c) of the National Emergencies Act, 50 U.S.C. 1641(c), and Executive Order 13313 of July 31, 2003.

---

5    Although the U.S. has imposed sanctions on Sudan under three separate Executive Orders, this assessment looks at the effectiveness of these sanctions in the aggregate.

The reports submitted pursuant to IEEPA provide a regular snapshot of licenses granted, transactions blocked, and the value of business disrupted. For example, in the period May 2007 through May 2008, OFAC blocked 65 transactions totaling over $1,117,000, and U.S. banks rejected 576 such transactions, resulting in a disruption of at least $133.2 million in business for Sudan.[6] Blockings are transactions in which the GOS has an interest and that were therefore blocked pursuant to the SSR. Funds wired in

| | |
|---|---|
| Number of Rejected Transactions: May 2000 – May 2008 | 5,777 |
| Value of Disrupted Business for Sudan: May 2000 – May 2008 | $745,300,000 |
| Value of Blocked Assets for Sudan as of Dec 2007 [1] | $48,200,000 |
| Value of Collected Penalties: Nov. 1998 – present | $1,530,000 (approx) |

1    These are not exclusively GOS assets. This figure includes assets owned by third parties that have been blocked due to indirect or contingent interests of the GOS.

connection with transactions in support of commercial activity in Sudan must be rejected and returned to the remitter if there is no blockable interest of the GOS.

Aggregated data from the sanctions program can be seen in the accompanying table. While this data can prove useful in showing the effectiveness of U.S. implementation and compliance efforts, such an accounting is not a measure of the full impact of the sanctions.

### B.    Impact on the Government of Sudan's Behavior

Assigning causality between the threat or imposition of economic sanctions and regime-level behavioral changes is fraught with peril. However, there are a number of examples that indicate correlations between the imposition of sanctions and the behavior of the GOS.

In response to the crisis in Darfur, the President announced an intensification of U.S. sanctions on the GOS. This included targeting for financial sanctions additional GOS-owned entities, designating individuals and entities responsible for the violence in Darfur, and pursuing a new UN Security Council resolution to impose additional multilateral sanctions on Sudan. Following the President's announcement, Treasury implemented sanctions against three Sudanese individuals and 31 Sudanese companies in May 2007. A week after the May 2007 designations, the Sudanese National Assembly convened a special session to discuss these latest sanctions and issued a parliamentary decree denouncing them. According to reporting by the U.S. Embassy in Khartoum, the GOS then began taking steps to sell off government assets that OFAC had identified – including shares of Sudatel, Sudan's primary telecommunications company. At the same time, within days of the President's announcement, the Central Bank of Sudan imposed broad restrictions on foreign currency transactions in Sudan. Although the GOS asserted that these actions were not connected to U.S. sanctions, the timing suggests otherwise.

Two weeks later, in June 2007, President Bashir announced that Sudan would agree to a deployment of a joint African Union-United Nations ("A.U.-U.N.") peacekeeping force in Darfur, after a lengthy period of resisting this step. It is difficult to judge the precise role that U.S. economic sanctions played in this decision, but it is also difficult to ignore the correlation. Although the deployment of this new force continues to face many obstacles, including resistance from the GOS, the joint A.U.-U.N. mission took over from the African Union mission on January 1, 2008, and the first peacekeepers are in place.

---

6    See Annex IV for additional data.

In the fall of 2007, the Central Bank of Sudan announced that, in light of U.S. sanctions, it would convert its foreign reserves from the U.S. dollar into other currencies, principally the euro, and would stop using the dollar in financial transactions. Citing the risk of blocked funds transfers and other disrupted transactions, the Governor of the Central Bank of Sudan further advised the GOS, the private sector, and Sudanese citizens against U.S. dollar transactions. It is too soon to gauge the economic impact of these decisions, but some economic analysts in Sudan have criticized them as potentially harmful to Sudan's small businesses.

According to senior U.S. officials, high-level GOS representatives have repeatedly expressed strong concern in meetings over the impacts of U.S. sanctions, including frustration that sanctions impede the GOS's ability to transfer funds or to find banks that will operate accounts for it. In a noteworthy example, at a 2007 meeting with U.S. officials, a cabinet member in the Sudanese government complained that U.S. sanctions were causing daily harm to Sudan, and that sanctions were interfering with all of the GOS's transfers. "All transfers are affected and now cost us more. I can't even get U.S. dollars now," the Sudanese official complained, adding, "I am thinking about what Sudan might have been since the [Comprehensive Peace Agreement] if not for sanctions."

> **"All transfers are affected and now cost us more. I can't even get U.S. dollars now."**
> – *High-level GOS representative*

In the past year, economic sanctions have assumed a more prominent role in the bilateral dialogue between the United States and the GOS. For example, during the most recent negotiations in the spring of 2008 on bilateral relations, the GOS delegation presented a timeframe for the lifting of sanctions as well a list of "urgent measures" that the GOS wants the U.S. government to undertake. All of these urgent measures related to U.S. economic sanctions, placing sanctions at the center of the talks. Although this most recent round of talks has broken down, the GOS's pointed objections to sanctions indicates the meaningful burden that sanctions continue to impose. It appears that the Bashir regime may be tiring of the years of sanctions and other barriers to the U.S.-Sudan relationship. Despite years of conflict and mistrust, the GOS seems to place a high priority on normalizing relations with the United States.

The pressure exerted by sanctions may have also resulted in certain unintended consequences. As noted by USAID officials, sanctions or the threat of sanctions have increased GOS leadership's feelings of being besieged. In response, the regime has sometimes reacted by increasing its harassment of U.S. humanitarian aid workers and U.N. peacekeepers, exacerbating the humanitarian and security situation for vulnerable populations.

## C.    *Economic Impact*

Sudan's economy is showing strong overall growth and stability. The GDP growth rate in both 2006 and 2007 exceeded 10 percent, and Sudan has been working with the IMF to institute macroeconomic reforms. However, beneath the top-level data, U.S. sanctions on Sudan have raised the cost of doing business for Sudan. The GOS has endeavored to navigate around U.S. efforts to isolate Sudan from the U.S. and international financial systems, but such maneuvers cannot completely shield Sudan from the impact of economic sanctions, as detailed below.

Without specific authorization from OFAC, Sudan is unable to use the U.S. banking system,

limiting Sudan's access to U.S. dollars.  Sanctions also have impeded Sudan's access to international financial markets and institutions.  For example, over the past year, Treasury has learned that a number of third-country banks, due in part to GOS conduct and reputational concerns, are cutting their ties with Sudan.  According to media reports, a primary third-country bank in Sudan has cut all ties with and departed from Sudan.  Although some banks have made limited exceptions to this new policy, others have told their Sudanese customers that they are closing their accounts and refusing to conduct any new business involving Sudan.

Sudan also is facing apprehension from foreign firms about staying in the country under the threat of further U.S. and multilateral sanctions and the growing influence of divestment campaigns.  According to media reports, several major non-U.S. firms stopped operating in Sudan in 2007.  Sudan's growing trade and investment relationships with China, India, and Gulf Arab countries, however, show the need for a multilateral approach to maintaining pressure on the Bashir regime.

U.S. sanctions against Sudan also appear to be impeding moves by Sudan-owned entities to raise revenue abroad.  Giad Motor Industry Co. Ltd., a state-owned domestic car and truck maker in Sudan, was among the thirty-one Sudanese companies designated in May 2007 for its assistance in providing armored vehicles to the GOS for military operations in Darfur.  Approximately one year later, Giad Motor prepared to launch its initial public offering on the Dubai stock market.  Brokers refused to participate in Giad Motor's deal on the Dubai exchange because of the designation and the company's connection to the Sudanese military.  Giad Motor was forced to withdraw its plans because of the pall cast by U.S. sanctions on the entity.

> According to sources familiar with the Giad Motor IPO deliberations, "at least two Middle Eastern brokerages, one in Abu-Dhabi and one in Dubai, refused to advise the IPO due to concerns over U.S. sanctions."
>
> – *Dow Jones Newswires*

Sanctions have prompted members of the Sudanese business community to speak out about the effect that sanctions are having on their businesses.  According to a former senior U.S. official, the Sudanese business community has cited the pressure of economic sanctions in urging the GOS to normalize relations with the United States.

It is worth noting that a number of other factors also impede growth in the Sudanese economy, including corruption and an under-skilled work force.

In the agricultural sector, which employs 80 percent of Sudan's work force and comprises one third of its GDP, there is also anecdotal evidence of the economic impact of sanctions.  For example, in December 2007, U.S. embassy officials in Sudan conducted a site visit to one of the largest sugar farms in the world.  The managing director of the farm told officials that U.S. sanctions have blocked his access to U.S. consultants (including the original designer of the farm), as well as U.S. equipment (such as crop harvesters and spare parts), both of which he needs to maximize the effectiveness and efficiency of his business.

In addition, although the petroleum sector in Sudan is strong as a whole, there have been challenges resulting from U.S. sanctions.  Sudan's petroleum sector has been hurt by a lack of access to U.S. and western expertise and refining, which specialize in the Dar blend of heavy crude

produced in Sudan. Because of the lack of access to the United States, Sudan has increasingly turned to Asian companies entering the Sudanese petroleum market. Sudan has responded to challenges in the petroleum sector in part by increasing additional exploration for reserves, some of which is being conducted by companies with ties to the government.[7] Although growth in the oil industry is strong, prolonged limitations on access to U.S. and Western European expertise, infrastructure, and technology are slowing and dampening the long-term efficiency, capacity, and profitability of the sector. For example, the oilfields that produce the profitable Nile Blend are maturing, and the new Dar blend crude had a weak debut – its high acidity makes it a challenge for many refineries to process, depressing its price on the world market.

## V.  U.S. GOVERNMENT EFFORTS TO MITIGATE THE EFFECTS OF SANCTIONS ON SOUTHERN SUDAN

The DPAA and E.O. 13412 have eased restrictions on transactions with the GOSS and Southern Sudan. Many of the prohibitions set forth in E.O. 13067 no longer apply to activities or related transactions with respect to Specified Areas of Sudan, which include Southern Sudan, Southern Kordofan/Nuba Mountains State, Blue Nile State, Abyei, Darfur, and marginalized areas in and around Khartoum, subject to certain conditions discussed below.[8] The following prohibitions in the SSR and E.O. 13412 continue to affect transactions involving Southern Sudan and other Specified Areas of Sudan:

(1) All property and interests in property of the GOS remain blocked countrywide; however, the regional GOSS is excluded from the blocking.

(2) All transactions relating to Sudan's petroleum or petrochemical industries are prohibited countrywide.

(3) The prohibition on trade with Sudan applies to goods, services, and technology that transit non-exempt areas of Sudan en route to the Specified Areas of Sudan; i.e., transshipments through non-specified areas are prohibited without a license (except those for humanitarian purposes).

(4) A financial transaction with a third-party depository institution, or a Sudanese depository institution not owned or controlled by the GOS, that is located in the Specified Areas of Sudan will be prohibited if it is routed through a depository institution located in the non-exempt areas of Sudan or one that is owned or controlled by the GOS, wherever located.

Although the Specified Areas of Sudan are exempt from certain sanctions, it is not always feasible to prevent sanctions from interfering with transactions in the South, and there can be complex difficulties in administering a sanctions regime that divides a single country into

---

7   One company with a substantial stake in these explorations is the Hi-Tech Petroleum Group, which was designated in May 2007, thus making the prohibition on exports of U.S. exploration technology to this company easily enforceable and clear to exporters and to financial institutions.

8   On October 31, 2007, Treasury amended the SSR to implement E.O. 13412 and to clarify the exemption of the Specified Areas of Sudan. The amendments also defined the term "marginalized areas in and around Khartoum" to mean the following official camps for internally displaced persons: Mayo, El Salaam, Wad El Bashir, and Soba.

two areas, with separate prohibitions applied to each area. For example, the Bank of Southern Sudan (the "BOSS") is not an independent institution, but a branch of the Bank of Sudan. As such, it is controlled by the GOS and is, therefore, a blocked entity for the purposes of Sudanese sanctions. The BOSS's lack of a separate corporate identity, coupled with the structure of petroleum revenue flow set forth in the 2005 Comprehensive Peace Agreement, makes it difficult to broadly license banking transactions with the GOSS.

The U.S. has attempted to address the GOSS's concerns with the issuance of two specific licenses to third-country commercial banks to hold accounts for the GOSS and the BOSS. OFAC also issued letters directly to the office of the GOSS's Mission in the United States and to another relevant entity clarifying the exemptions in E.O. 13412. The goal of these letters is to allay the concerns of U.S. persons and others who wish to conduct business in Southern Sudan. In addition, OFAC has held a series of meetings with representatives of the GOSS, and a wide range of parties interested in doing business in Southern Sudan, to address concerns about how to minimize the impact of E.O. 13067 and the SSR on Southern Sudan.

OFAC has also worked to minimize any hindrances created by E.O. 13067 and the SSR on humanitarian aid efforts in Darfur and elsewhere in Sudan. Pursuant to E.O. 13412, most transactions related to the activities of NGOs in the Specified Areas of Sudan do not require a specific license from OFAC. In addition, recent amendments to the SSR include a general license that authorizes humanitarian transshipments through non-exempt areas to or from Southern Sudan or Darfur; this general license is subject to annual review. OFAC also may issue specific licenses – as necessary – for transactions related to humanitarian or religious activities in the Specified Areas of Sudan (such as use of the financial system that operates in the non-exempt areas).

The exemptions set forth in E.O. 13412 have been in place only since October 2006, and it is difficult to gauge fully how effective they have been at shielding Southern Sudan and the other Specified Areas of Sudan from the effects of U.S. sanctions. However, OFAC expects that the implementation of E.O. 13412 and OFAC's subsequent efforts outlined above will remove or ease sanctions-related impediments to investment and economic development in these areas.

## VI. ACHIEVING MULTILATERAL SANCTIONS AGAINST SUDAN

It is a simple truth that sanctions are most effective when imposed multilaterally. The United States has, by far, the broadest Sudan sanctions regime in the world. As U.S. sanctions against Sudan are already quite extensive, multilateral sanctions offer the most powerful opportunity to increase the effectiveness of U.S. sanctions at bringing about change in regime behavior in Sudan. Multilateral cooperation with our allies could augment the pressure being exerted by U.S. sanctions against the GOS.

For example, current UN Security Council and EU sanctions against Sudan include only a limited arms embargo and a travel ban and asset freeze on four individuals.[9] The Central Bank of Sudan's decision to convert its reserves to the euro and other regional currencies increases the need for increased partnership with the EU.

---

9    Annex V of this report provides a side-by-side comparison of U.S. and UN and EU sanctions on Sudan.

## VII. CONCLUSION

The actions of the GOS continue to fuel the grave humanitarian crisis in Sudan and remain a destabilizing influence in the region. The Treasury Department will continue to implement the restrictive measures in place – as well as measures to help mitigate the effects of sanctions on Southern Sudan and the Specified Areas – to advance U.S. government foreign policy pursuant to the Sudan Accountability and Divestment Act, the Darfur Peace and Accountability Act, the Trade Sanctions Reform and Export Enhancement Act of 2000, the International Emergency Economic Powers Act, Executive Order 13067, Executive Order 13400, and Executive Order 13412.

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

# ANNEX I: SPECIALLY DESIGNATED NATIONALS LIST – SUDAN

| SDN ENTRIES BY PROGRAM | |
|---|---|
| Program | Quantity |
| **Government of Sudan/E.O. 13067 and E.O. 13412** | **162** |

| Name | Type |
|---|---|
| 1. ACCOUNTS & ELECTRONICS EQUIPMENTS, c/o ENGINEERING EQUIPMENT CORPORATION | Entity |
| 2. ADVANCED ENGINEERING WORKS | Entity |
| 3. ADVANCED MINING WORKS COMPANY LIMITED | Entity |
| 4. ADVANCED PETROLEUM COMPANY | Entity |
| 5. ADVANCED TRADING AND CHEMICAL WORKS COMPANY LIMITED | Entity |
| 6. AFRICAN DRILLING COMPANY | Entity |
| 7. AFRICAN OIL CORPORATION | Entity |
| 8. AGRICULTURAL BANK OF SUDAN | Entity |
| 9. AL SUNUT DEVELOPMENT COMPANY | Entity |
| 10. ALAKTAN COTTON TRADING COMPANY | Entity |
| 11. ALFARACHEM COMPANY LIMITED | Entity |
| 12. AMIN EL GEZAI COMPANY | Entity |
| 13. ARAB CEMENT COMPANY | Entity |
| 14. ARAB SUDANESE BLUE NILE AGRICULTURAL COMPANY | Entity |
| 15. ARAB SUDANESE SEED COMPANY | Entity |
| 16. ARAB SUDANESE VEGETABLE OIL COMPANY | Entity |
| 17. ASSALAYA SUGAR COMPANY LIMITED | Entity |
| 18. ATBARA CEMENT COMPANY LIMITED | Entity |
| 19. AUTOMOBILE CORPORATION | Entity |
| 20. BABANOUSA MILK PRODUCTS FACTORY | Entity |
| 21. BANK OF KHARTOUM | Entity |
| 22. BANK OF SUDAN | Entity |
| 23. BASHAIER | Entity |
| 24. BLUE NILE BREWERY | Entity |
| 25. BLUE NILE PACKING CORPORATION | Entity |

| | | |
|---|---|---|
| 26. | BUILDING MATERIALS AND REFRACTORIES CORPORATION | Entity |
| 27. | COPTRADE COMPANY LIMITED (PHARMACEUTICAL AND CHEMICAL DIVISION) | Entity |
| 28. | COPTRADE ENG AND AUTOMOBILE SERVICES CO LTD. | Entity |
| 29. | DUTY FREE SHOPS CORPORATION | Entity |
| 30. | EL GEZIRA AUTOMOBILE COMPANY | Entity |
| 31. | EL NILEIN BANK | Entity |
| 32. | EL TAKA AUTOMOBILE COMPANY | Entity |
| 33. | EMIRATES AND SUDAN INVESTMENT COMPANY LIMITED | Entity |
| 34. | ENGINEERING EQUIPMENT COMPANY, c/o ENGINEERING EQUIPMENT CORPORATION | Entity |
| 35. | ENGINEERING EQUIPMENT CORPORATION | Entity |
| 36. | EXPLORATION AND PRODUCTION AUTHORITY (SUDAN) | Entity |
| 37. | FARMERS COMMERCIAL BANK | Entity |
| 38. | FOOD INDUSTRIES CORPORATION | Entity |
| 39. | FRIENDSHIP SPINNING FACTORY | Entity |
| 40. | GEZIRA TANNERY | Entity |
| 41. | GEZIRA TRADE & SERVICES COMPANY LIMITED | Entity |
| 42. | GIAD AUTOMOTIVE INDUSTRY COMPANY LIMITED | Entity |
| 43. | GIAD MOTOR INDUSTRY COMPANY LIMITED | Entity |
| 44. | GINEID SUGAR FACTORY | Entity |
| 45. | GREATER NILE PETROLEUM OPERATING COMPANY LIMITED | Entity |
| 46. | GROUPED INDUSTRIES CORPORATION | Entity |
| 47. | GUNEID SUGAR COMPANY LIMITED | Entity |
| 48. | HAGGAR ASSALAYA SUGAR FACTORY | Entity |
| 49. | HI TECH GROUP | Entity |
| 50. | HICOM | Entity |
| 51. | HICONSULT | Entity |
| 52. | HI-TECH CHEMICALS | Entity |
| 53. | HI-TECH PETROLEUM GROUP | Entity |
| 54. | ICDB | Entity |
| 55. | INDUSTRIAL BANK COMPANY FOR TRADE & DEVELOPMENT LIMITED | Entity |
| 56. | INDUSTRIAL BANK OF SUDAN (n.k.a. EL NILEIN INDUSTRIAL DEVELOPMENT BANK GROUP) | Entity |

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

| | | |
|---|---|---|
| 57. | INDUSTRIAL PRODUCTION CORPORATION | Entity |
| 58. | INDUSTRIAL RESEARCH AND CONSULTANCY INSTITUTE | Entity |
| 59. | INGASSANA MINES HILLS CORPORATION | Entity |
| 60. | JUBA DUTY FREE SHOP | Entity |
| 61. | KARIMA DATE FACTORY | Entity |
| 62. | KARIMA FRUIT AND VEGETABLE CANNING FACTORY | Entity |
| 63. | KASSALA FRUIT PROCESSING COMPANY | Entity |
| 64. | KASSALA ONION DEHYDRATION FACTORY | Entity |
| 65. | KENAF SOCKS FACTORY | Entity |
| 66. | KHARTOUM CENTRAL FOUNDRY | Entity |
| 67. | KHARTOUM COMMERCIAL AND SHIPPING COMPANY LIMITED | Entity |
| 68. | KHARTOUM TANNERY | Entity |
| 69. | KHOR OMER ENGINEERING COMPANY | Entity |
| 70. | KORDOFAN COMPANY | Entity |
| 71. | KRIKAH INDUSTRIES GROUP | Entity |
| 72. | LEATHER INDUSTRIES CORPORATION | Entity |
| 73. | MALUT SUGAR FACTORY | Entity |
| 74. | MANGALA SUGAR FACTORY | Entity |
| 75. | MASPIO CEMENT CORPORATION | Entity |
| 76. | MAY ENGINEERING COMPANY, c/o ENGINEERING EQUIPMENT CORPORATION | Entity |
| 77. | MILITARY COMMERCIAL CORPORATION | Entity |
| 78. | MODERN ELECTRONIC COMPANY | Entity |
| 79. | MODERN LAUNDRY BLUE FACTORY | Entity |
| 80. | MODERN PLASTIC & CERAMICS INDUSTRIES COMPANY | Entity |
| 81. | NATIONAL CIGARETTES CO, LTD. | Entity |
| 82. | NATIONAL COTTON AND TRADE COMPANY | Entity |
| 83. | NATIONAL ELECTRICITY CORPORATION | Entity |
| 84. | NATIONAL EXPORT-IMPORT BANK (n.k.a. BANK OF KHARTOUM GROUP) | Entity |
| 85. | NATIONAL REINSURANCE COMPANY (SUDAN) LIMITED | Entity |
| 86. | NEW HAIFA SUGAR FACTORY | Entity |
| 87. | NEW HALFA SUGAR FACTORY COMPANY LIMITED | Entity |
| 88. | NEW KHARTOUM TANNERY | Entity |

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

| | | |
|---|---|---|
| 89. | NILE CEMENT COMPANY LIMITED | Entity |
| 90. | NILE CEMENT FACTORY | Entity |
| 91. | NORTHWEST SENNAR SUGAR FACTORY | Entity |
| 92. | OIL CORPORATION | Entity |
| 93. | OMDURMAN SHOE FACTORY | Entity |
| 94. | PEOPLE'S CO-OPERATIVE BANK | Entity |
| 95. | PETROHELP PETROLEUM COMPANY LIMITED | Entity |
| 96. | PETROLEUM GENERAL ADMINISTRATION | Entity |
| 97. | PORT SUDAN COTTON AND TRADE COMPANY | Entity |
| 98. | PORT SUDAN DUTY FREE SHOP | Entity |
| 99. | PORT SUDAN EDIBLE OILS STORAGE CORPORATION | Entity |
| 100. | PORT SUDAN REFINERY LIMITED | Entity |
| 101. | PORT SUDAN SPINNING FACTORY | Entity |
| 102. | POSTS AND TELEGRAPHS PUBLIC CORPORATION | Entity |
| 103. | PUBLIC CORPORATION FOR BUILDING AND CONSTRUCTION | Entity |
| 104. | PUBLIC CORPORATION FOR IRRIGATION AND EXCAVATION | Entity |
| 105. | PUBLIC CORPORATION FOR OIL PRODUCTS AND PIPELINES | Entity |
| 106. | PUBLIC ELECTRICITY AND WATER CORPORATION | Entity |
| 107. | RABAK OIL MILL | Entity |
| 108. | RAINBOW FACTORIES | Entity |
| 109. | RAM ENERGY COMPANY LIMITED | Entity |
| 110. | REA SWEET FACTORY | Entity |
| 111. | RED SEA HILLS MINERALS COMPANY, c/o SUDANESE MINING CORPORATION | Entity |
| 112. | RED SEA STEVEDORING | Entity |
| 113. | REFRIGERATION AND ENGINEERING IMPORT COMPANY | Entity |
| 114. | ROADS AND BRIDGES PUBLIC CORPORATION | Entity |
| 115. | SACKS FACTORY | Entity |
| 116. | SENNAR SUGAR COMPANY LIMITED | Entity |
| 117. | SHEIKAN INSURANCE AND REINSURANCE COMPANY LIMITED | Entity |
| 118. | SHEREIK MICA MINES COMPANY, c/o SUDANESE MINING CORPORATION | Entity |
| 119. | SILOS AND STORAGE CORPORATION | Entity |
| 120. | SPINNING AND WEAVING CORPORATION | Entity |
| 121. | SRC | Entity |

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

| | | |
|---|---|---|
| 122. | SRDC | Entity |
| 123. | STATE CORPORATION FOR CINEMA | Entity |
| 124. | STATE TRADING COMPANY | Entity |
| 125. | SUDAN ADVANCED RAILWAYS | Entity |
| 126. | SUDAN AIR | Entity |
| 127. | SUDAN COTTON COMPANY | Entity |
| 128. | SUDAN COTTON COMPANY LIMITED | Entity |
| 129. | SUDAN DEVELOPMENT CORPORATION | Entity |
| 130. | SUDAN EXHIBITION AND FAIRS CORPORATION | Entity |
| 131. | SUDAN GEZIRA BOARD | Entity |
| 132. | SUDAN MASTER TECHNOLOGY | Entity |
| 133. | SUDAN NATIONAL BROADCASTING CORPORATION | Entity |
| 134. | SUDAN OIL CORPORATION | Entity |
| 135. | SUDAN OIL SEEDS COMPANY LIMITED | Entity |
| 136. | SUDAN SOAP CORPORATION | Entity |
| 137. | SUDAN TEA COMPANY, LTD. | Entity |
| 138. | SUDAN TELECOMMUNICATIONS COMPANY LIMITED | Entity |
| 139. | SUDAN WAREHOUSING COMPANY | Entity |
| 140. | SUDANESE COMPANY FOR BUILDING AND CONSTRUCTION LIMITED | Entity |
| 141. | SUDANESE ESTATES BANK | Entity |
| 142. | SUDANESE FREE ZONES AND MARKETS COMPANY | Entity |
| 143. | SUDANESE INTERNATIONAL TOURISM COMPANY, c/o TOURISM AND HOTELS CORPORATION | Entity |
| 144. | SUDANESE MINING CORPORATION | Entity |
| 145. | SUDANESE PETROLEUM CORPORATION | Entity |
| 146. | SUDANESE REAL ESTATE SERVICES COMPANY | Entity |
| 147. | SUDANESE SAVINGS BANK | Entity |
| 148. | SUDANESE SUGAR PRODUCTION COMPANY LIMITED | Entity |
| 149. | SUDAPET LTD. | Entity |
| 150. | SUGAR AND DISTILLING INDUSTRY CORPORATION | Entity |
| 151. | TAHEER PERFUMERY CORPORATION | Entity |
| 152. | TAHREER PERFUMERY CORPORATION, EL, | Entity |
| 153. | TEA PACKETING AND TRADING COMPANY | Entity |

| | | |
|---|---|---|
| 154. | TOURISM AND HOTELS CORPORATION | Entity |
| 155. | UNITY BANK | Entity |
| 156. | WAD MADANI DUTY FREE SHOP | Entity |
| 157. | WAFRA CHEMICALS & TECHNO-MEDICAL SERVICES LIMITED | Entity |
| 158. | WAFRA PHARMA LABORATORIES | Entity |
| 159. | WAU FRUIT AND VEGETABLE CANNING FACTORY | Entity |
| 160. | WHITE NILE BATTERY COMPANY | Entity |
| 161. | WHITE NILE BREWERY | Entity |
| 162. | WHITE NILE TANNERY | Entity |

| Program | Quantity |
|---|---|
| Darfur/E.O. 13400 | 8 |

| Name | Type |
|---|---|
| 163. AZZA AIR TRANSPORT COMPANY LTD. | Entity |
| 164. AUF, Awad Ibn | Individual |
| 165. HARUN, Ahmad Muhammed | Individual |
| 166. TAHA, Khalil Ibrahim Mohamed Achar Foudail | Individual |
| 167. EL HASSAN, Gaffar Mohmed (also on UN list pursuant to UNSCR 1591) | Individual |
| 168. HILAL, Moussa (also on UN list pursuant to UNSCR 1591) | Individual |
| 169. BADRI, Gabril Abdul Kareem (also on UN list pursuant to UNSCR 1591) | Individual |
| 170. SHANT, Adam Yacub (also on UN list pursuant to UNSCR 1591) | Individual |

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

# ANNEX II: EXECUTIVE ORDERS

*Executive Order 13067– Trade Embargo and Blocking Sanctions: Government of Sudan*

*Executive Order 13400 – Blocking Sanctions: Individuals*

*Executive Order 13412 – Limited Geographic Exemptions*

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

59989

Federal Register

Vol. 62, No. 214

Wednesday, November 5, 1997

# Presidential Documents

Title 3

The President

Executive Order 13067 of November 3, 1997

### Blocking Sudanese Government Property and Prohibiting Transactions With Sudan

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*), and section 301 of title 3, United States Code:

I, WILLIAM J. CLINTON, President of the United States of America, find that the policies and actions of the Government of Sudan, including continued support for international terrorism; ongoing efforts to destabilize neighboring governments; and the prevalence of human rights violations, including slavery and the denial of religious freedom, constitute an unusual and extraordinary threat to the national security and foreign policy of the United States, and hereby declare a national emergency to deal with that threat. I hereby order:

**Section 1.** Except to the extent provided in section 203(b) of IEEPA (50 U.S.C. 1702(b)) and in regulations, orders, directives, or licenses that may be issued pursuant to this order, all property and interests in property of the Government of Sudan that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of United States persons, including their overseas branches, are blocked.

**Sec. 2.** The following are prohibited, except to the extent provided in section 203(b) of IEEPA (50 U.S.C. 1702(b)) and in regulations, orders, directives, or licenses that may be issued pursuant to this order:

(a) the importation into the United States of any goods or services of Sudanese origin, other than information or informational materials;

(b) the exportation or reexportation, directly or indirectly, to Sudan of any goods, technology (including technical data, software, or other information), or services from the United States or by a United States person, wherever located, or requiring the issuance of a license by a Federal agency, except for donations of articles intended to relieve human suffering, such as food, clothing, and medicine;

(c) the facilitation by a United States person, including but not limited to brokering activities, of the exportation or reexportation of goods, technology, or services from Sudan to any destination, or to Sudan from any location;

(d) the performance by any United States person of any contract, including a financing contract, in support of an industrial, commercial, public utility, or governmental project in Sudan;

(e) the grant or extension of credits or loans by any United States person to the Government of Sudan;

(f) any transaction by a United States person relating to transportation of cargo to or from Sudan; the provision of transportation of cargo to or from the United States by any Sudanese person or any vessel or aircraft of Sudanese registration; or the sale in the United States by any person holding authority under subtitle 7 of title 49, United States Code, of any transportation of cargo by air that includes any stop in Sudan; and

(g) any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in this order.

Sec. 3. Nothing in this order shall prohibit:

(a) transactions for the conduct of the official business of the Federal Government or the United Nations by employees thereof; or

(b) transactions in Sudan for journalistic activity by persons regularly employed in such capacity by a news-gathering organization.

Sec. 4. For the purposes of this order:

(a) the term person    means an individual or entity;

(b) the term  entity  means a partnership, association, trust, joint venture, corporation, or other organization;

(c) the term United  States person  means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States; and

(d) the term Government  of Sudan  includes the Government of Sudan, its agencies, instrumentalities and controlled entities, and the Central Bank of Sudan.

Sec. 5. The Secretary of the Treasury, in consultation with the Secretary of State and, as appropriate, other agencies, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to me by IEEPA, as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order.

Sec. 6. Nothing contained in this order shall create any right or benefit, substantive or procedural, enforceable by any party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

Sec. 7. (a) This order shall take effect at 12:01 a.m. eastern standard time on November 4, 1997, except that trade transactions under contracts in force as of the effective date of this order may be performed pursuant to their terms through 12:01 a.m. eastern standard time on December 4, 1997, and letters of credit and other financing agreements for such underlying trade transactions may be performed pursuant to their terms.

(b) This order shall be transmitted to the Congress and published in the **Federal Register.**

*William J. Clinton*

THE WHITE HOUSE,
*November 3, 1997.*

[FR Doc. 9729464
Filed 11497;   11:22 am]
Billing code 319501P

25483

Federal Register
Vol. 71, No. 83
Monday, May 1, 2006

# Presidential Documents

Title 3—

The President

Executive Order 13400 of April 26, 2006

## Blocking Property of Persons in Connection With the Conflict in Sudan's Darfur Region

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*)(IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*)(NEA), section 5 of the United Nations Participation Act, as amended (22 U.S.C. 287c)(UNPA), and section 301 of title 3, United States Code,

I, GEORGE W. BUSH, President of the United States of America, find that an unusual and extraordinary threat to the national security and foreign policy of the United States is posed by the persistence of violence in Sudan's Darfur region, particularly against civilians and including sexual violence against women and girls, and by the deterioration of the security situation and its negative impact on humanitarian assistance efforts, as noted by the United Nations Security Council in Resolution 1591 of March 29, 2005, and, to deal with that threat, hereby expand the scope of the national emergency declared in Executive Order 13067 of November 3, 1997, with respect to the policies and actions of the Government of Sudan, and hereby order:

**Section 1.** (a) Except to the extent that sections 203(b) (1), (3), and (4) of IEEPA (50 U.S.C. 1702(b)(1), (3), and (4)) may apply, or to the extent provided in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all property and interests in property of the following persons, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, including any overseas branch, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in:

(i) the persons listed in the Annex to this order; and

(ii) any person determined by the Secretary of the Treasury, after consultation with the Secretary of State:

(A) to have constituted a threat to the peace process in Darfur;

(B) to have constituted a threat to stability in Darfur and the region;

(C) to be responsible for conduct related to the conflict in Darfur that violates international law;

(D) to be responsible for heinous conduct with respect to human life or limb related to the conflict in Darfur;

(E) to have directly or indirectly supplied, sold, or transferred arms or any related materiel, or any assistance, advice, or training related to military activities to:

(1) the Government of Sudan;
(2) the Sudan Liberation Movement/Army;
(3) the Justice and Equality Movement;
(4) the Janjaweed; or
(5) any person (other than a person listed in subparagraph (E)(1) through (E)(4) above) operating in the states of North Darfur, South Darfur, or West Darfur that is a belligerent, a nongovernmental entity, or an individual;

(F) to be responsible for offensive military overflights in and over the Darfur region;

(G) to have materially assisted, sponsored, or provided financial, materiel, or technological support for, or goods or services in support of, the activities described in paragraph (a)(ii)(A) through (F) of this section or any person listed in or designated pursuant to this order; or

(H) to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person listed in or designated pursuant to this order.

(b) I hereby determine that, to the extent section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) may apply, the making of donations of the type of articles specified in such section by, to, or for the benefit of any person listed in or designated pursuant to this order would seriously impair my ability to deal with the national emergency declared in Executive Order 13067 and expanded in this order, and I hereby prohibit such donations as provided by paragraph (a) of this section.

(c) The prohibitions of paragraph (a) of this section include, but are not limited to, (i) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person listed in or designated pursuant to this order, and (ii) the receipt of any contribution or provision of funds, goods, or services from any such person.

**Sec. 2.** (a) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 3.** For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States; and

(d) the term "arms or any related materiel" means arms or related materiel of all types, military aircraft, and equipment, but excludes:

(i) supplies and technical assistance, including training, intended solely for use in authorized monitoring, verification, or peace support operations, including such operations led by regional organizations;

(ii) supplies of non-lethal military equipment intended solely for humanitarian use, human rights monitoring use, or protective use, and related technical assistance, including training;

(iii) supplies of protective clothing, including flak jackets and military helmets, for use by United Nations personnel, representatives of the media, and humanitarian and development workers and associated personnel, for their personal use only;

(iv) assistance and supplies provided in support of implementation of the Comprehensive Peace Agreement signed January 9, 2005, by the Government of Sudan and the People's Liberation Movement/Army; and

(v) other movements of military equipment and supplies into the Darfur region by the United States or that are permitted by a rule or decision of the Secretary of State, after consultation with the Secretary of the Treasury.

**Sec. 4.** For those persons listed in or designated pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order

would render these measures ineffectual. I therefore determine that, for these measures to be effective in addressing the national emergency declared in Executive Order 13067 and expanded by this order, there need be no prior notice of a listing or determination made pursuant to section 1 of this order.

**Sec. 5.** The Secretary of the Treasury, after consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA and UNPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government, consistent with applicable law. All agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order and, where appropriate, to advise the Secretary of the Treasury in a timely manner of the measures taken. The Secretary of the Treasury shall ensure compliance with those provisions of section 401 of the NEA (50 U.S.C. 1641) applicable to the Department of the Treasury in relation to this order.

**Sec. 6.** The Secretary of the Treasury, after consultation with the Secretary of State, is hereby authorized to submit the recurring and final reports to the Congress on the national emergency expanded by this order, consistent with section 401(c) of the NEA (50 U.S.C. 1641(c)) and section 204(c) of the IEEPA (50 U.S.C. 1703(c)).

**Sec. 7.** The Secretary of the Treasury, after consultation with the Secretary of State, is hereby authorized to determine, subsequent to the issuance of this order, that circumstances no longer warrant the inclusion of a person in the Annex to this order and that the property and interests in property of that person are therefore no longer blocked pursuant to section 1 of this order.

**Sec. 8.** This order is not intended to, and does not, create any right, benefit, or privilege, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

**Sec. 9.** This order is effective at 12:01 a.m. eastern daylight time on April 27, 2006.

THE WHITE HOUSE,
*April 26, 2006.*

Billing code 3195–01–P

Federal Register

Vol. 71, No. 200

Tuesday, October 17, 2006

# Presidential Documents

---

Title 3—

**The President**

Executive Order 13412 of October 13, 2006

## Blocking Property of and Prohibiting Transactions With the Government of Sudan

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*)(IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*)(NEA), and section 301 of title 3, United States Code, and taking appropriate account of the Darfur Peace and Accountability Act of 2006 (the "Act"),

I, GEORGE W. BUSH, President of the United States of America, find that, due to the continuation of the threat to the national security and foreign policy of the United States created by certain policies and actions of the Government of Sudan that violate human rights, in particular with respect to the conflict in Darfur, where the Government of Sudan exercises administrative and legal authority and pervasive practical influence, and due to the threat to the national security and foreign policy of the United States posed by the pervasive role played by the Government of Sudan in the petroleum and petrochemical industries in Sudan, it is in the interests of the United States to take additional steps with respect to the national emergency declared in Executive Order 13067 of November 3, 1997. Accordingly, I hereby order:

**Section 1.** Except to the extent provided in section 203(b) of IEEPA (50 U.S.C. 1702(b)) or in regulations, orders, directives, or licenses that may be issued pursuant to this order, all property and interests in property of the Government of Sudan that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of United States persons, including their overseas branches, are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

**Sec. 2.** Except to the extent provided in section 203(b) of IEEPA (50 U.S.C. 1702(b)) or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order, all transactions by United States persons relating to the petroleum or petrochemical industries in Sudan, including, but not limited to, oilfield services and oil or gas pipelines, are prohibited.

**Sec. 3.** (a) Any transaction by a United States person or within the United States that evades or avoids, has the purpose of evading or avoiding, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 4.** (a) Subject to paragraph (b) of this section, restrictions imposed by this order shall be in addition to, and do not derogate from, restrictions imposed in and under Executive Order 13067.

(b)(i) None of the prohibitions in section 2 of Executive Order 13067 shall apply to activities or related transactions with respect to Southern Sudan, Southern Kordofan/Nuba Mountains State, Blue Nile State, Abyei, Darfur, or marginalized areas in and around Khartoum, provided that the activities or transactions do not involve any property or interests in property of the Government of Sudan.

(ii) The Secretary of State, after consultation with the Secretary of the Treasury, may define the term "Southern Sudan, Southern Kordofan/Nuba Mountains State, Blue Nile State, Abyei, Darfur, or marginalized areas in and around Khartoum" for the purposes of this order.

(c) The function of the President under subsection 6(c)(1) of the Comprehensive Peace in Sudan Act of 2004 (Public Law 108–497), as amended by section 5(a)(3) of the Act, is assigned to the Secretary of the Treasury as appropriate in the performance of such function.

(d) The functions of the President under subsection 6(c)(2) and the last sentence of 6(d) of the Comprehensive Peace in Sudan Act of 2004 (Public Law 108–497), as amended by subsections 5(a)(3) and (b), respectively, of the Act, are assigned to the Secretary of State, except that the function of denial of entry is assigned to the Secretary of Homeland Security.

(e) The functions of the President under sections 7 and 8 of the Act are assigned to the Secretary of State.

Sec. 5. Nothing in this order shall prohibit:

(a) transactions for the conduct of the official business of the Federal Government or the United Nations by employees thereof; or

(b) transactions in Sudan for journalistic activity by persons regularly employed in such capacity by a news-gathering organization.

Sec. 6. For the purposes of this order:

(a) the term "person" means an individual or entity;

(b) the term "entity" means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(c) the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States; and

(d) the term "Government of Sudan" includes the Government of Sudan, its agencies, instrumentalities, and controlled entities, and the Central Bank of Sudan, but does not include the regional government of Southern Sudan.

Sec. 7. For those persons whose property and interests in property are blocked pursuant to section 1 of this order who might have a constitutional presence in the United States, I find that, because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13067 there need be no prior notice of a determination made pursuant to section 1 of this order.

Sec. 8. The Secretary of the Treasury, after consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may redelegate any of these functions to other officers and agencies of the United States Government, consistent with applicable law. All executive agencies of the United States Government are hereby directed to take all appropriate measures within their authority to carry out the provisions of this order and, where appropriate, to advise the Secretary of the Treasury in a timely manner of the measures taken. The Secretary of the Treasury shall ensure compliance with those provisions of section 401 of the NEA (50 U.S.C. 1641) applicable to the Department of the Treasury in relation to this order.

Sec. 9. This order is not intended to, and does not, create any right, benefit, or privilege, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, instrumentalities, or entities, its officers or employees, or any other person.

Federal Register / Vol. 71, No. 200 / Tuesday, October 17, 2006 / Presidential Documents     **61371**

**Sec. 10.** This order shall take effect upon the enactment of the Darfur Peace and Accountability Act of 2006.

THE WHITE HOUSE,
*October 13, 2006.*

[FR Doc. 06–8769
Filed 10–16–06; 11:27 am]
Billing code 3195–01–P

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

## ANNEX III: EXAMPLES OF CIVIL PENALTIES

### STENA BULK LLC ("STENA BULK") SETTLES SUDANESE SANCTIONS REGULATIONS ALLEGATIONS:

Stena Bulk has remitted $426,486 to settle allegations of violations of the Sudanese Sanctions Regulations occurring on or about December 4, 2002, to February 13, 2003, and February 8, 2007, to March 19, 2007. OFAC alleged that Stena Bulk appears to have facilitated trade-related transactions with Sudan on behalf of foreign entities by providing transportation-related services for the transportation of oil to Sudan and the exportation of Sudanese-origin oil without an OFAC license. Stena Bulk voluntarily disclosed the matter to OFAC.

### FAIRFIELD CHEMICAL CARRIERS INC. SETTLES SUDANESE SANCTIONS VIOLATION ALLEGATION:

Fairfield Chemical Carriers Inc., Wilton ("Fairfield") has remitted $37,500 to settle an allegation of a violation of the Sudanese Sanctions Regulations occurring during May 2006. OFAC alleged that Fairfield engaged in a transportation related transaction involving the transportation of cargo from Port Sudan to Amsterdam. Fairfield cooperated with OFAC's investigation and has implemented improvements to its OFAC compliance program. Fairfield did not voluntarily disclose this matter to OFAC.

### SKE MIDWESTERN, INC. SETTLES ALLEGED VIOLATIONS OF SUDANESE SANCTIONS:

SKE Midwestern, Inc., San Francisco, CA ("SKE") has remitted $20,000 to settle alleged violations of the Sudanese Sanctions Regulations occurring during October 2003 and November 2005. OFAC alleged that SKE brokered the exportation of goods from Sudan to Mexico. SKE did not voluntarily disclose this matter to OFAC.

### NATIONAL AUSTRALIA BANK LTD. SETTLES BURMESE SANCTIONS REGULATIONS, SUDANESE SANCTIONS REGULATIONS AND CUBAN ASSETS CONTROL REGULATIONS ALLEGATIONS:

National Australia Bank Ltd. ("NAB") has remitted $100,000 to settle allegations of violations of the Burmese Sanctions Regulations, 31 C.F.R. Part 537, the Sudanese Sanctions Regulations, 31 C.F.R. Part 538, and the Cuban Assets Control Regulations, 31 C.F.R. Part 515, occurring between November 2003 and December 2005 involving the processing of several transactions through the United States. The transactions were voluntarily disclosed to OFAC following an extensive review by NAB of all of its transactions that were processed through the United States during this time period. Due to the significant remediation taken by the bank, including major upgrades to its worldwide compliance policies, as well as the fact that the violations were voluntarily disclosed, OFAC mitigated the potential penalties for these transactions by nearly 90%.

### PARKDALE MILLS, INC. ASSESSED A PENALTY FOR VIOLATING THE SUDANESE SANCTIONS REGULATIONS:

Parkdale Mills, Inc., Gastonia, NC 28055 ("Parkdale") has been assessed an $8,250 civil monetary for its violation of the Sudanese Sanctions Regulations occurring on October 20, 2003. Parkdale attempted to import goods in the form of cotton from Sudan to Norfolk Port, USA, when it initiated a financial transaction to pay for the goods. Parkdale did not voluntarily disclose this matter to OFAC.

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

## ANNEX IV: AGGREGATED ANNUAL IEEPA REPORT DATA

### Blocked Assets and Disrupted Business Under U.S. Sanctions Against Sudan (2000-2008)



1   The data contained in this area graph do not reflect licenses issued or plaintiff settlements.
2   Each area of this graph reflects aggregated data.  The top line represents the cumulative value of the aggregated blocked assets and aggregated disrupted business over the period 2000-2008.



REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

# ANNEX V:   COMPARISON OF U.S. WITH UN AND EU SANCTIONS ON SUDAN

| UNITED STATES | UN AND EUROPEAN UNION | |
|---|---|---|
| Blocking of property and interests in property of the Government of Sudan in the U.S. or in the control of U.S. persons (E.O. 13067) | No similar measure | |
| Ban on importation into the U.S. of any goods or services of Sudanese origin (E.O. 13067) | No similar measure | |
| Ban on the exportation or re-exportation, directly or indirectly, to Sudan of any goods, technology, or services from the U.S. or by a U.S. person (E.O. 13067) | *EU* <br><br> Ban on sale, supply, transfer or export of arms and related materiel of all types by nationals of member states to Sudan, including the provision of technical, brokering or other services, or financing or financial assistance, related to military activities (CCP 2005/411/CFSP) | *UN* <br><br> Ban on sale or supply of arms and related materiel of all types by nationals of member states to all non-governmental entities and individuals, including the Janjaweed, parties to the N'Djamena Ceasefire Agreement, and any other belligerents, operating in the states of North Darfur, South Darfur, and West Darfur, including an obligation to prevent the provision of technical training or assistance related to the provision, manufacture, maintenance or use of such items (UNSCR 1556 (2004) and UNSCR 1591 (2005)) |
| Ban on the facilitation by a U.S. person of the exportation or reexportation of goods, technology, or services to Sudan (E.O. 13067) | No similar measure | |
| Ban on the performance by any U.S. person of any contract in support of an industrial, commercial, public utility, or governmental project in Sudan (E.O. 13067) | No similar measure | |
| Ban on the grant or extension of credits or loans by any U.S. person to the GOS (E.O. 13067) | No similar measure | |
| Ban on any transaction by a U.S. person relating to transportation of cargo to or from Sudan, or the provision or sale of any transportation of cargo by air (E.O. 13067) | No similar measure | |
| Ban on all transactions by U.S. persons relating to the petroleum or petro-chemical industries in Sudan (E.O. 13412) | No similar measure | |
| Blocking assets of 170 individuals and entities (E.O. 13400) | Blocking assets of 4 individuals designated by the UN (CCP 2005/411/CFSP; UNSCR 1556 (2004), and UNSCR 1591 (2005)) | |

REPORT TO CONGRESS JANUARY 2009
EFFECTIVENESS OF U.S. ECONOMIC SANCTIONS WITH RESPECT TO SUDAN

| UNITED STATES | UN AND EUROPEAN UNION |
|---|---|
| Travel restrictions on senior GOS officials and other individuals determined by the appropriate authorities (Darfur Peace and Accountability Act) | Travel restrictions on 4 individuals designated by the UN (CCP 2005/411/CFSP; UNSCR 1556 (2004) and UNSCR 1591 (2005)) |
| U.S. executive directors to international financial institutions must "vote against and actively oppose any extension by the respective institution of any loan, credit, or guarantee to the GOS" (Sudan Peace Act, Comprehensive Peace in Sudan Act) | No similar measure |